UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| MARK J. LANDON,<br>Plaintiff, | : | |
| vs. | : | No. 8:15-cv-02272-CEH-JSS |
| CITY OF NORTH PORT, FLORIDA, *et al.*,<br>Defendants. | : | Report of Kenneth R. Wallentine |

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports:

Plaintiff's Amended Civil Complaint

Plaintiff's Responses to Interrogatories

Psychiatric Evaluation for Mark Landon

Defendant's Motion to Dismiss Second Amended Complaint

Defendant's Responses to Interrogatories

Defendant's 1st, 2nd and 3rd Responses to Requests for Production

North Port Police Department Offense Report Case No. 2014-07-1362

North Port Police Department Response to Resistance Report Case No.2014-07-1362

North Port Police Department Dispatch Log related to the incident

Photographs of arrest location and plaintiff

North Port Police Department Police Department Policy Manual excerpts

North Port Police Department Response to Resistance Policy

North Port Fire Rescue report

Deposition of Chief Kevin Vespia

Deposition of Captain Christopher Morales

Deposition of Officer Keith Bush

Deposition of Mark Landon

Walt Zalisko report

Kyle Heyen report

Dr. Carlos Diaz report

Florida Department of Law Enforcement K9 Manual

Miscellaneous North Port Police Department Internal Affairs reports

North Port Police Department Comprehensive Overview of Police Services for 2013

Officer Keith Bush and Police Service Dog Nero training logs

Kenneth R. Wallentine states as follows:

1.     In the instant matter, I have relied upon the documents, diagrams, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to,

my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a.   **Abbreviated synopsis of reported information:**

On the July 20, 2014, Mark Landon ("plaintiff") was drinking heavily and considering suicide. Just after 8:30 p.m., his 80 year-old mother, Rose Landon, called police seeking help to deal with plaintiff. She reported that she found plaintiff in the garage of the home that they shared. Plaintiff had a knife and he was bleeding from a deep self-inflicted cut on his left wrist. Mrs. Landon had shouted for her next-door neighbor and son-in-law, Peter Madish, to help.

Madish struggled with plaintiff, whom he described as "heavily drunk." Plaintiff told Madish that "this was going to be the end," apparently suggesting that this was a repeated attempt at suicide, but one which plaintiff clearly intended to succeed. Madish was able to wrest the knife from plaintiff. Madish tossed the knife into his own garage next door. Plaintiff went back into his garage and re-emerged with another knife. He shouted obscenities at Madish. Plaintiff told Madish, "its gonna be real soon," and plaintiff ran to the woods at the back of the two neighboring houses.

North Port Police Department Officers Dino Murges and Keith Bush responded to the call for service. Mrs. Landon told the officers that plaintiff had recently gone through a divorce and that his ex-wife had accused him of assault by allegedly stabbing her with a screwdriver. She said that plaintiff believed that he would be going to prison for several years and that he could not face that possibility. Madish told the officers that plaintiff had run towards the woods and that he had a knife in his hand.

Officer Bush deployed his police service dog, Tomy, and moved toward the wooded area to track plaintiff, with Officer Murges as his cover officer. After a brief track, they found plaintiff laying under the brush. From approximately 15 feet from plaintiff, Officer Bush called out to plaintiff. Plaintiff rolled to the left, away from the officers, so that his hands were hidden. Officer Bush and Officer Murges both called out to plaintiff to show them his hands.

Officer Bush repeated his commands several times and waited for plaintiff to present his hands. Officer Bush told plaintiff that if he did not show his hands, Officer Bush would send Tomy. Plaintiff did not respond. Officer Bush commanded Tomy to bite plaintiff. Plaintiff presented his hands. Officer Bush commanded Tomy to release plaintiff and Tomy did so.

Officer Murges pulled plaintiff from the brush to a narrow clear area. Officers McKinney and Connell arrived. Officer Murges pulled plaintiff to an area where the medics could gain better access. Medics transported plaintiff for treatment. The officers searched for plaintiff's second knife, but were unable to locate it.

b.  **The decision to deploy a service dog to locate plaintiff was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams.**

1.  Police service dogs are unique public safety tools that can assist in a variety of public safety applications because of their keen sense of smell. One such application is the location of missing persons. The majority of policies guiding operation of police service dog teams provide for the service dog to be used to locate endangered persons even when such persons are not actively sought to answer for suspected criminal acts. For example, the International Association of

Chiefs of Police Model Policy on police service dogs policy explicitly provides for the use of police canines "to track missing persons." The primary stated purpose of the police service dog, according to the North Port Police Department canine unit policy, is the protection of officers or citizens from serious harm or death. The policy acknowledges that the use of a police service dog team to "track and search for missing or endangered persons . . . can aid in the quick conclusion of a search."

2.  Officers Murges and Bush were sent to deal with a mentally ill person in acute crisis amid a suicide attempt that involved a serious injury. When the officers arrived at Mrs. Landon's home, they learned that plaintiff had been drinking heavily and was severely injured by a self-inflicted wound. They could see that there was a blood trail on the ground. Madish reported that he had wrestled one knife away from plaintiff; Madish also told the officers that plaintiff had rearmed himself with another knife[1] before fleeing into the woods. Mrs. Landon and Madish were understandably and visibly upset, having seen plaintiff with self-inflicted cuts on his chest and a gaping slash to his left wrist. Moreover, plaintiff told them that "this was it," a statement they understood to mean that he fully intended to complete his suicide just then.

3.  A reasonable and well-trained police officer would recognize that plaintiff's condition and circumstances were uncertain, perilous and required immediate

---

[1] The second knife was never located by officers who searched the area in the ensuing darkness. Whether or not the knife was located, or even whether plaintiff carried it all the way into the woods, does not mitigate the report by an apparently reliable eyewitness who reported about both the first and the second knives.

action to locate him and to prevent him from inflicting further injury or death on himself. A reasonable and well-trained police service dog handler would recognize that a police service dog would be a valuable tool to hasten the search and discovery of the severely-wounded plaintiff.

4. Police officers in the State of Florida are trained on the process for involuntary temporary custody of mentally ill or emotionally disturbed persons. The Florida Mental Health Act, Fl. Stat. 394.467 *et seq*, commonly known as the "Baker Act," allows police officers, medical and mental health professionals, or judges, to effect the temporary involuntary commitment and mental health examination of an individual. Officers are taught that the Baker Act process may be initiated upon evidence that an individual possibly has a mental illness and presents a danger of harm to self or to others, among other criteria. Presented with the information provided by Mrs. Landon and Madish, a reasonable and well-trained officer would have apprehended plaintiff and taken him into custody for further action under the Baker Act. Confirming this, a Florida form BA-52, known as the "Baker Act form" was completed to facilitate mental health evaluation for plaintiff.

5. Presented with the information provided to Officer Bush upon his response to Mrs. Landon's call, a reasonable and well-trained police service dog handler would have deployed a police service dog to track and locate plaintiff.

c.    **Officer Bush's decision to use his police service dog to apprehend and control
plaintiff was reasonable and was consistent with generally accepted policies,
practices and training for police service dog teams and law enforcement officers.**

1.    Plaintiff had not gone far after rushing away from Madish. Officers Bush and
Murges located plaintiff after a fairly short track. As Officer Bush and Officer
Murges tracked into the wooded area, they also took several other steps to quickly
control the situation, such as directing that radio traffic be limited to emergency
communication, coordinating other officers' responses to set up a containment
perimeter, and relaying their movements to the other officers. Officers' Bush and
Murges concern upon locating plaintiff shifted to taking him safely into custody.

2.    Lying prone on the ground, with brush obscuring the officers' view, and his hands
concealed by his torso, plaintiff presented the danger of the unknown. The
officers had every reason to believe that plaintiff's behavior had been and would
continue to be erratic and violent. Plaintiff had just struggled violently with
Madish as Madish wrested plaintiff's first knife from him. Plaintiff was
apparently under the influence of drugs and/or alcohol (Madish described plaintiff
as "heavily drunk or on something"). The officers were concerned about their
own safety as well as how to get plaintiff into a position where he could receive
urgent medical care for the gaping wound on his wrist.

3.    Under these circumstances, the first command that any officer would
give–repeatedly and emphatically–would be "show me your hands." There is
perhaps no instruction more frequently and emphatically taught to police officers,

recruit and veteran officers alike, than the necessity to watch the hands of subjects. Officer Bush gave plaintiff multiple commands to show his hands. Though plaintiff later stated that he has no memory of his actions, plaintiff physically responded to Officer Bush's command to show his hands by rolling further into the cover of the brush, more fully concealing his hands. Officer Bush repeated his commands and allowed time for plaintiff to follow his direction.

4.    After Officer Bush directed plaintiff to show his hands, waited and saw no compliance, he commanded Tomy to apprehend plaintiff by biting. Officer Bush continued to shout at plaintiff to show his hands. Upon being bitten by Tomy, plaintiff showed his hands. Officer Bush commanded Tomy to release, and Tomy promptly complied. Officers Bush and Murges then coordinated movements of other officers and the medics to facilitate medical treatment as quickly as possible. These actions were reasonable under the circumstances faced by the officers and were consistent with the actions of a reasonable and well-trained police service dog handler.

5.    Deliberate and considered reflection in hindsight raises hypothetical alternative options to take a person in plaintiff's condition into custody. For example, one not familiar with the functionality of an electronic control device such as a TASER® might suggest that device as a possibly effective method. The probes fired from a TASER cartridge are tiny and are tethered by wires as thin as human hair. They are significantly effected by wind and easily blocked by light vegetation. Chemical sprays, such as oleoresin capsicum, would be ineffective

unless plaintiff were facing the officers at a relatively short distance and the officers had an unobstructed access to plaintiff's face. Another superficially attractive option would be to overwhelm plaintiff with numerous officers approaching him and grabbing limbs and body parts. However, such action would violate time-honored and proven principles of not "going hands-on" with a person believed to be concealing a bladed weapon.

6. In light of the circumstances created by plaintiff's actions, Officer Bush's decision to use Tomy to track and to apprehend plaintiff was a reasonable decision and was consistent with well-established police practices, policies and training.

d. **The North Port Police Department properly supervised the Officer Bush and police service dog Tomy. The supervision structure and practice team was consistent with generally accepted policies, practices and training for police service dog teams.**

1. As the primary assigned officer, Officer Murges completed a "Response to Resistance" report. This document is distinct from the police incident report. It is a report intended to begin an administrative review of the officers' actions and force decisions. The North Port Police Department uses the Response to Resistance report to document the incident for consideration of statutory, training and policy compliance through review by escalating levels of command staff. Moreover, each Response to Resistance is tracked and presented at monthly meetings of command staff and reported in the monthly Comprehensive Overview of Police Services. The Response to Resistance report was first reviewed by the

duty supervisor, Sergeant Michael Saxton. The next level of review was administrative, completed by Lieutenant Gary Arsenault.

2.  Additional Response to Resistance reports were completed by Officers Keith Bush and Stevie Connell. Officer Connell briefly aimed an electronic control device at plaintiff as he was on the ground. It is unlikely that plaintiff was ever aware that an electronic control device had been presented. It was not activated and the display constituted a very minimal level of force. Notwithstanding, it is noteworthy that the North Port Police Department mandates reporting of this level of force and that the action is monitored and evaluated by command staff.

3.  The information reported by Officer Bush on the Response to Resistance report that he completed is generally redundant to the information contained in his incident report. However, far from being an unnecessary duplication of data, the department's requirement that the core facts of the police service dog deployment be documented in a Response to Resistance report facilitates review of the deployment and force decision by the broader command staff and not just those supervisors in the direct chain of command for the police service dog teams. This is a strong indicator of accountability and transparency in the agency's use of force review and analysis.

4.  The North Port Police Department canine unit is guided by policies that are similar to many service dog unit policies used throughout the United States. The North Port Police Department canine unit policy mandates that the department's police service dog teams meet Florida state standards. The State of Florida is

among a small number of states that requires regular service dog team
certification testing. Regular service dog team testing and certification is
indicative of a well-supervised police service dog unit and actually exceeds
common practice throughout the United States.

4.     At the time of this incident, the police service dog team of Officer Bush and Tomy
was certified by the Florida Department of Law Enforcement, as required by
North Port Police Department policies and by State of Florida regulations.
Further, I am aware that the police service dog team of Officer Bush and Tomy
received numerous national, state and local awards in trials conducted by
nationally-recognized certification and standards associations promoting best
practices in police service dog operations. I am aware that Officer Bush has a
reputation in the police service dog community as being a particularly adept
handler and that he is certified as a police service dog trainer by the Florida
Department of Law Enforcement. I am also aware that Tomy was recognized as a
very obedient service dog during his time as a police service dog.

2.     In reaching my opinions in this matter I have relied upon my training and experience in
public safety acquired throughout my career. A summary of my qualifications, publications,
litigation history and fee schedule are recited herein.

3.     **My qualifications as an expert in this subject matter include the following:**

I am a law enforcement officer in the State of Utah. I became certified as a law enforcement
officer in the State of Utah in 1982. Until April 1, 2014, I was employed with the Utah Attorney
General, where I served as the Chief of Law Enforcement. I retired from that position in 2014. I

am currently employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinate a statewide use of force training initiative and coordinate officer-involved shooting investigations and other special investigations. I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I commanded the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the

police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Firearms Instructor Course, Utah Sheriffs' Association Command College, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst ®. I am a certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.     I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on

the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6. I consult and provide expert witness opinions on police procedures, and use of force issues. I perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of, and legal advisor to, a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7. I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a member of the board of directors of Crisis Intervention Team-Utah, the umbrella organization for crisis intervention team training for Utah public safety. I also serve as a member of the board of directors of the Institute for the Prevention of In-Custody Deaths, a research and education foundation. I have served as President of the Utah Peace Officers Association, Board Member of the Utah SWAT

Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.     Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. I have provided police service dog training and certification standards consultation for two police service dog

organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9. I am Senior Legal Advisor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies. In that capacity, I have assisted in the drafting and review of use of force and police service dog policies in current use by more than 2,100 police agencies and correctional facilities in the United States.

10. **My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, 2nd ed., was published by Lexis/Nexis Matthew Bender in February 2014, with the 2016 Supplement published in December 2016. It includes an extensive discussion of use of force by police officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters on search and seizure and use of force by police officers. My other published works, limited to the past ten years, include: *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested*

*Persons*, Police Chief, V. 81, No. 10 (2014); *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.    **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony. I bill for actual travel

expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12.    **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Frasier v. McCallum, et al.*, No. 1:14-cv-00009-MP-GRJ, United States District Court for the Northern District of Florida, 2015. Deposition testimony given on behalf of defendant. Subject matter: mistaken arrest. *Wolffis v. City of Gainesville*, No. 1:14-cv-130, United States District Court for the Northern District of Florida, 2015. Deposition testimony given on behalf of defendant. Subject matter: excessive force. *Castillo v. City of Tempe*, No. 2:12-CV-02225-ROS, United States District Court for the District of Arizona, 2015. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2015. Trial and deposition testimony given on behalf of the defendants. Subject matter: police force to effect arrest. *Williams v. TASER, Internat'l and the City of Charlotte*, No. 3:12-CV-838, United States District Court for the Western District of North Carolina, 2014. Trial and deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Ali v. City of Tempe*, No. CV2013-091264, Superior Court, State of Arizona, Maricopa County, 2014. Deposition testimony given on behalf of defendants. Subject

matter: excessive force. *Texiera v. United States of America, et al.*, No. 2:11-CV-02022, United States District Court for the District of Nevada, 2014. Trial and deposition testimony given on behalf of the defendants. Subject matter: police canines. *Clark v. Box Elder County et al.*, No. 1:13-cv-00079-CW, United States District Court for the District of Utah, 2014. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Chief v. West Valley City Police, et al.*, No. 2:11-CV-643, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Campbell & Gemperline v. City of Springboro et al.*, No. 1:08-cv-00737, United States District Court for the Southern District of Ohio, 2013. Deposition testimony given on behalf of the defendants. Subject matter: police canines. *Thompson v. City of Lebanon*, No. 1:10-CV-0035, United States District Court for the Middle District of Tennessee, 2013. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Boggs v. City of Waterloo*, No. LACV116584-CW, Blackhawk County District Court, 2013. Deposition testimony given on behalf of defendants.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, deposition testimony,

consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

Officer Bush's decision to deploy Tomy to locate plaintiff was reasonable under the circumstances created by plaintiff and presented to the responding officers and was consistent with generally accepted policies, practices and training for police service dog teams. Officer Bush's decision to command Tomy to apprehend and control plaintiff by biting him was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams and law enforcement officers. The North Port Police Department properly supervised the Officer Bush and Tomy. The supervision structure and practice team was consistent with generally accepted policies, practices and training for police service dog teams.

Kenneth R. Wallentine
January 23, 2017