

# COURT REPORTING

MARK J. LANDON

vs

CITY OF NORTH PORT

Case No.8:15-cv-2272-CEH-JSS

KENNETH R.

WALLENTINE

March 01, 2017

Alpine Court Reporting
Locations in Salt Lake City and Provo
801-691-1000

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

-ooOoo-

MARK J. LANDON,                    :

      Plaintiff,          : CASE NO.
                         8:15-cv-2272-CEH-JSS
v.                                 :

CITY OF NORTH PORT,                :

      Defendant.          :
_____


DEPOSITION OF KENNETH R. WALLENTINE


Taken on Wednesday, March 1, 2017

At 1:08 p.m.


At Alpine Court Reporting

2975 West Executive Parkway, Suite 236

Lehi, Utah 84093


Reported by:  Tamera L. Stephens, RPR, CRR, CSR

1                      APPEARANCES

2   For the Plaintiff:

3           DON R. CAHALL, ESQ.
            (Appearing via Zoom)
4           MORAN, SANCHY & ASSOCIATES
            2197 Ringling Boulevard
5           Sarasota, Florida 34237
            (941) 366-1800
6           donrcahall@gmail.com

7   For the Defendant:

8           ROBERT C. SHEARMAN, ESQ.
            (Appearing via Zoom)
9           HENDERSON, FRANKLIN, STARNES & HOLT, P.A.
            1715 Monroe Street
10          Fort Myers, FL 33902
            (239) 344-1100
11          robert.shearman@henlaw.com

12
                        -ooOoo-
13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    WITNESS                                    PAGE

3        KENNETH R. WALLENTINE

4        By Mr. Cahall................................    4

5

6                            -ooOoo-

7

8                        INDEX TO EXHIBITS

9    EXHIBIT NO.                                 PAGE

10   1      Photograph...............................   86

11   2      K-9 Patrol Training Log..................   106

12   3      Resistance Report........................   111

13   4      IACP Model Policy Law Enforcement Canines....   115

14

15

16

17

18

19

20

21

22

23

24

25

1    March 1, 2017                           1:08 p.m.

2                      PROCEEDINGS

3                 KENNETH R. WALLENTINE,

4    called as a witness herein, having been first duly

5    sworn by the Certified Court Reporter to tell the

6    truth, was examined and testified as follows:

7

8                      EXAMINATION

9    BY MR. CAHALL:

10       Q    Good morning, Mr. Wallentine.  As you know, my

11   name is Don Cahall and I represent the plaintiff

12   Mark Landon in this case.

13            Can you go ahead and just state your full name

14   for the record?

15       A    Sure.  Ken Wallentine.

16       Q    Obviously I'm taking your deposition today to

17   discuss the expert opinion that you are rendering in

18   this case and any other facts or knowledge that you may

19   have concerning that opinion.

20            I know you have probably given depositions

21   before, correct?

22       A    I have.

23       Q    Okay.  So I'm not going to go over any of the

24   standard rules, but obviously if you need to take a

25   break, that's fine, whatever, just let me know and we

1    can go ahead and do that.

2            And if you don't understand my questions, just

3    let me know and I will try to rephrase them the best I

4    can.

5        A    Thank you.

6        Q    Did you bring a copy of your notice of taking

7    deposition with you?

8        A    I did not.

9        Q    Okay.  Did you bring all of the documents that

10   are responsive to Schedule A of that notice with you?

11       A    I did.

12       Q    Okay.  Are those documents printed out on hard

13   paper?

14       A    No.  I'm a pretty paperless person in general.

15       Q    Okay.  So what type of electronic format are

16   they on?

17       A    They are on a disk.

18       Q    Okay.  So what documents are on that disk?

19       A    My entire file.

20       Q    Okay.  So does that file contain any documents

21   that are not listed in your expert report on page 1 and

22   2?

23       A    It does.

24       Q    What documents does it contain that are not

25   listed in your report?

1     A     There are a couple of deposition transcripts

2     that I received in the last month or so.  I don't recall

3     the names of the deponents.  So there's two -- two

4     deposition transcripts, and then my file also contains a

5     copy of a PDF of my report that obviously you have.  And

6     at the time I wrote the report, I obviously didn't list

7     that on my report.

8     Q     Right.  So you don't recall the two deponents?

9     A     I don't.

10    Q     Okay.  Do you know if, after reviewing those

11    deposition transcripts, it changed your opinion as

12    included in your final report in any way?

13    A     It did not.

14    Q     Okay.  So are there any other documents on that

15    disk that are not included in your final report?

16    A     Yes.

17    Q     Okay.  What else?

18    A     The bill that I sent to Mr. Shearman's firm,

19    oh, probably a month or so ago.

20          MR. SHEARMAN:  I hope we paid it.

21          THE WITNESS:  You know, I would have to ask my

22    accountant.  I don't know.

23    Q     (BY MR. CAHALL)  Okay.  Anything else?

24    A     No, sir.

25    Q     Are there any documents not on that disk that

1    you reviewed in this case that are not included in your

2    written report?

3        A    I recently took a look at my -- well, I started

4    to read my report, ran out of time.  Again, obviously

5    that's not listed on my report, but I read a few pages

6    of my own report a couple days ago.

7        Q    Do you have any e-mail communications included

8    in the disk that you have with you?

9        A    No, I don't.

10       Q    Were there any e-mail communications between

11   you and counsel who retained you for this case?

12       A    The majority, and perhaps all, of the documents

13   were e-mailed not through -- not by counsel, but I

14   believe a paralegal or a legal secretary.

15       Q    And were you retained pursuant to a written

16   retainer agreement?

17       A    No.

18       Q    And how did defense counsel contact you to

19   retain you for this matter?

20       A    I don't recall.  I suspect it was probably a

21   telephone call.

22       Q    Have you been retained by defense counsel in

23   the past, or was this the first case?

24       A    This is the first time I have worked for

25   Mr. Shearman.  I don't believe I have ever worked for

1    his firm before.  If I -- I don't know.  I don't think

2    so.  But this is the first time I have become acquainted

3    with Mr. Bob Sherman.

4         Q     Okay.  Have you previously rendered an expert

5    opinion for the City of North Port?

6         A     I have.

7         Q     Okay.  And was that in a civil litigation case?

8         A     It was.

9         Q     What case is that?

10        A     I don't recall the name of the plaintiff, but

11   if it's one that I was deposed in or testified at a

12   trial, it would be listed on my report toward the end.

13   I have a list of all of the cases in which I have given

14   testimony in the last four years.

15        Q     I don't see the City of North Port in that list

16   anywhere in your expert report.  Do you recall how long

17   ago it was that you gave an opinion to them for?

18        A     I don't.  And it may not be a case that I

19   testified in.

20        Q     Okay.  So you have no idea -- can you provide a

21   general time estimate as to when you provided an expert

22   opinion for the City of North Port?

23        A     I think it would have been within the last

24   three years.

25        Q     And what was the case about?

1    A    It was civil litigation involving a police

2    canine incident.

3    Q    And what were the general facts of the case?

4    A    Wow.  Well, I haven't looked at that case in

5    quite some time and had many pieces of civil litigation.

6    And, you know, my full-time job is an investigator, so

7    many cases since then.  I don't have a clear

8    recollection.  But generally I believe it involved a

9    burglary.

10    Q    And what were you asked to render an opinion on

11    for that case?

12    A    The use of a police service canine and

13    generally the police practices in that case.

14    Q    Do you recall if it was an excessive force

15    case?

16    A    I don't specifically recall whether that was

17    part of the cause of action or not.

18    Q    Would you have a copy of your report that you

19    provided to the City of North Port?

20    A    With me?  No.

21    Q    Not with you.  Do you have it in any of your

22    files?

23    A    Not related to this case.  I suspect that I

24    might have a copy somewhere.

25    Q    I just want to go over a couple of the

1    documents that you say you reviewed in preparation of

2    your report as listed on page 1 and 2 of your final

3    expert report.

4            You mentioned that you reviewed a psychiatric

5    evaluation for Mark Landon.  Who was that psychiatric

6    evaluation done by?

7        A    It was a mental health provider.  I don't

8    recall the names of any of the actual clinical staff

9    involved.

10       Q    Do you recall the date of that evaluation?

11       A    I do not.  I don't.

12       Q    Okay.  Is it a document that's contained on the

13   disk that you brought with you?

14       A    Yes.  It would be a document that was provided

15   to me in this case.

16       Q    Okay.  And do you remember what the opinion of

17   the psychiatric evaluator was?

18       A    I do not.

19       Q    Would you recall if any medical diagnosis was

20   made by the psychiatric evaluator?

21       A    I don't recall.

22       Q    Okay.  You also mentioned that you reviewed

23   defendant's first, second, and third responses to

24   requests for production.  Are the documents that were

25   included in those responses also included in the CD that

1   you have with you?

2       A    Correct.

3       Q    Okay.  Which officers' response to resistance

4   reports did you review?

5       A    Well, I know that I looked at Officer Bush's.

6   There were a couple of others.  If they were contained

7   in defendant's responses to your request for production

8   of documents or written interrogatories, I would have

9   reviewed them.

10      Q    So you recall Officer Bush's response to

11  resistance.  Do you recall any of the other officers'

12  names?

13      A    I recall looking at a number of response to

14  resistance forms.  I can't segregate out for you those

15  reports by name.

16      Q    Did I cut out?

17           MR. SHEARMAN:  I can still hear you.

18           THE WITNESS:  No.

19      Q    (BY MR. CAHALL)  I just asked you if all of the

20  response to resistance reports that you reviewed are

21  included in the CD that you have with you?

22      A    Yes.

23      Q    And you mentioned that you reviewed photographs

24  in this case as well.  Do you recall who those

25  photographs were taken by?

1      A     I do not.

2      Q     Do you recall if the photographs were taken by

3   CSI Watts, W-a-t-t-s?

4      A     I don't recall the name of the photographer.  I

5   do believe that it was a crime scene technician or a

6   crime scene investigator that took those photographs.

7      Q     And did you review any photographs taken by any

8   of the responding officers?

9      A     I reviewed a file of photographs that had been

10  provided to you.  I don't know that I can identify

11  specifically which photographs were taken by whom.  My

12  impression was they were taken by crime scene staff.

13     Q     Okay.  And you had stated in your expert report

14  that they were photographs of arrest location and

15  plaintiff.  Was that a typo or were you under the

16  impression that plaintiff was arrested?

17     A     They were taken at the location that the

18  plaintiff was discovered and generally portray him while

19  he was still in situ in that location.

20     Q     Okay.  But you are aware that plaintiff wasn't

21  arrested in this incident, correct?

22     A     That's correct.

23     Q     What excerpts from the North Port Police

24  Department policy manual did you review?

25     A     Those that were provided to me.  I believe

1　specifically I recall reviewing the police service dog

2　policy portion.　There may have been other sections.

3　　　Q　　Would any other sections be included in the CD

4　that you have?

5　　　A　　If I was provided it or reviewed it, it's on

6　the CD.

7　　　Q　　Okay.　And you also mentioned you reviewed the

8　Florida Department of Law Enforcement K-9 manual in

9　preparation for your opinion in this case.　Do you

10　recall the date of that K-9 manual?

11　　　A　　I don't.　And I have -- I believe that it was

12　the one that was in effect in 2014.

13　　　Q　　And are you aware as to whether that manual has

14　been revised since then?

15　　　A　　I don't know that it has or has not.

16　　　Q　　Is that something that's available on FDLE's

17　web site?

18　　　A　　It's generally available.　Whether they post it

19　on their web site or not, I'm not certain, but it's not

20　difficult to get ahold of.

21　　　Q　　Do you have a copy of it on the CD?

22　　　A　　I do not.

23　　　Q　　And you mentioned reviewing North Port Police

24　Department's internal affairs reports.　Were those just

25　the IA reports that may have related to alleged

1  excessive use of force?

2      A    That's my impression.  I'm sure there were

3  topic areas that were not provided to me.  Well, I'm not

4  sure.  I believe there may have been -- you know, there

5  may have been speeding or -- any number -- rude conduct,

6  any number of topic areas, the reports for which were

7  not provided to me for review.

8      Q    Is there a time frame which these internal

9  affairs documents pertain to?

10     A    Well, I'm certain there is a time frame.  I

11  don't recall what the span of documents was.

12     Q    Okay.  But are those included in your CD that

13  you have with you as well?

14     A    They are.

15     Q    And then you mentioned you reviewed the COPS

16  reports for the North Port Police Department for 2013.

17  Did you review COPS reports for any other year?

18     A    I may have looked at the first part of 2014.

19          I'm just going to pause for the benefit of the

20  reporter.  He is using the term "COPS," and it's an

21  acronym, so it's all in caps, C-O-P-S.

22          Go ahead, sir.

23     Q    Thanks for that clarification.

24          And so do you recall one way or the other

25  whether you looked at 2014 COPS reports?

1    A    I do not.  I don't recall.  If they were in the

2  file of COPS reports that was provided to me, I would

3  have reviewed them.

4    Q    Okay.  And would they also be on that disk you

5  have?

6    A    Yes, sir.

7    Q    And you also mention you reviewed training logs

8  for Officer Keith Bush and police service dog Nero.  Do

9  you recall the dates of those training logs?

10   A    I don't.  There was quite a span, but I don't

11  recall the dates.

12   Q    Did you also review training logs for the

13  K-9 Tomy?

14   A    Yes.  But again, I can't -- I can't give you a

15  specific span of dates.

16   Q    Would any logs that you reviewed also be on

17  that CD you have with you?

18   A    Correct.

19   Q    And then also you stated that you relied, in

20  part, on your own publications in rendering your opinion

21  in this case.  Are there any specific publications that

22  you relied on for your opinion in this case?

23   A    Well, I have -- there was a book published by

24  LexisNexis called the K9 Officer's -- or the

25  K9 Handler's Legal Handbook of which I am the sole

1  author, the initial edition and then the second and

2  third updated editions.  Certainly there were materials

3  there that I would have considered in preparing my

4  report.

5      There's also a book known as Street Legal.

6  It's the American Bar Association deskbook on criminal

7  procedure of which I am also the sole author, and there

8  is a chapter there with treatment on police use of

9  force, including the application of police service dogs

10  in various missions and deployments.

11      I suspect that -- well, I have written a number

12  of articles.  They are all listed there in my report.

13  There probably is some overlap, but those are the two

14  principal publication that come to mind.

15      Q    What is the theme on Officer's Legal Handbook

16  about?  Is that a training document -- or training book?

17      A    It is a -- it's a -- in law school we refer to

18  those as "hornbooks."  It's a treatise.  LexisNexis has

19  a series of subject matter -- experts treatises on

20  things like DUI Enforcement and Search and Seizure

21  Handbook and so forth.

22      It's a handbook to guide defense counsel,

23  prosecutors, law enforcement officers, civil defense

24  counsel, plaintiff's attorneys in navigating legal

25  issues surrounding the use of police service dogs in a

1  wide range of deployment situations ranging from search

2  and seizure questions for an accelerant detector dog in

3  a suspected arson case to a case similar to the one at

4  discussion today or looking for a lost child, border

5  searches, and so forth.  It's a fairly lengthy book with

6  a pretty broad scope of coverage.

7      Q    What outside publications did you rely on?

8      A    That I didn't write?

9      Q    Correct.

10     A    Only those that I have cited in my report.

11     Q    You mentioned that you had a billing record on

12 the CD that you have with you.  Do you recall what the

13 total amount you have invoiced defense counsel in this

14 case is?

15     A    I don't know.

16     Q    Does that invoice include time for preparing

17 for this deposition today?

18     A    It does not.

19     Q    And I'm assuming it also doesn't include time

20 for the actual deposition today?

21     A    It does not.  You will be receiving a bill for

22 that.  That's consistent with the fee statement in my

23 report.

24     Q    What was the total of the invoice?

25     A    I don't know.

1      Q      I'm sorry?

2      A      I don't know.  I don't recall how much I have

3  invoiced.

4      Q      When is the payment due from defense counsel

5  for your billing in this case?

6      A      I don't know, Mr. Cahall.  There are a few

7  things that perhaps I should care about more, but when I

8  get paid is not one of them.  I don't -- the statements

9  go out in a form.  The payments come in.  The accountant

10 tracks them.  I pay taxes.  They come when they come.

11     Q      Is that principle going to apply to the invoice

12 you send my firm as well?

13     A      Well, I will admit, I did ask about your

14 reputation for being upright and paying your bills and

15 was assured that you are an honorable attorney.  So

16 yeah, the principle applies as well.  I have been in law

17 enforcement for a long time, sir, and it takes more than

18 a late bill to really get me going, so...

19     Q      I want to talk about some of the other cases

20 you have been retained as an expert on as listed in your

21 expert report for this case.  You mentioned that you

22 have never had a court decline -- decline to find that

23 you were an expert witness.  Have you ever been

24 challenged -- has one of your expert opinions ever been

25 challenged in court?

1      A      Well, I certainly had -- in a number of cases

2   there's been an expert retained by plaintiff or defense,

3   whichever -- on the opposite side that I was working on,

4   and there has been -- there have been a couple of

5   occasions where there has been what we would refer to in

6   the Tenth Circuit as Daubert challenge.  I suspect they

7   probably use the same terminology in the Eleventh

8   Circuit.

9           But I have never had the court find in such a

10  hearing that there was not a basis under the rules for

11  my opinion and never been excluded from testifying.

12     Q      And do you recall how many times your opinion

13  has been challenged under Daubert or Daubert

14  (pronouncing)?

15     A      Yeah, I -- some day I want to find out just how

16  that is pronounced.

17          I believe two or three times.  Two come to

18  mind.

19     Q      In your work as an expert witness, have you

20  ever rendered an expert opinion that a law enforcement

21  agency used excessive force on an individual?

22     A      Yes.

23     Q      Was that in a civil or criminal case?

24     A      Both.

25     Q      Was it in one or more civil cases?

1        A     Well, more.  I'm -- I know your follow-up

2   question is how many, and more than one.  I don't recall

3   precisely how many.

4        Q     Are those cases listed in your expert report?

5        A     Well, that list goes back four years, so I

6   believe at least one of them will be.

7        Q     Okay.  Which one?

8        A     It's out of California, and I believe -- I'm

9   going -- give me just a second.  I'm going to have to

10  think about the -- it's a town not far from Monterey.  I

11  know that doesn't help you very much.

12       Q     No.

13       A     Well, it's between Monterey and Half Moon Bay

14  on California Highway 1.

15       Q     You don't have a printed copy of your expert

16  report with you?

17       A     I do have a printed copy of that report, and I

18  am looking now.  I believe I'm mistaken.  It apparently

19  also has fallen outside the four-year limit.

20       Q     Do you remember the name of the case?

21       A     I don't.

22       Q     What court was it in?

23       A     It was in a California state administrative

24  tribunal.  And the name of that would have been the same

25  as the name of the town that I can't recall.

1      Q      And can you provide me a general overview of

2    the facts of that case?

3      A      Yes.  There was -- I don't recall the

4    underlying crime.  I believe that it may have been theft

5    of anhydrous ammonia from an agricultural area.

6            Anhydrous ammonia is a fairly toxic chemical

7    that is used commonly as a fertilizer for certain kinds

8    of agricultural operations, and it also can be a

9    precursor for the manufacture of methamphetamine using a

10   particular chemical process.  And so the theft is fairly

11   serious because it's a precursor, but also because it's

12   a dangerous chemical.

13           I don't recall how it is the officer was drawn

14   to the attention of the vehicle in which the contraband

15   was located, but there was a traffic stop.  The officer

16   encountered the -- the plaintiff on foot.  There was

17   some struggle.  The officer used a -- I believe the

18   officer used a remote deployment device to open the door

19   for his police service dog, and then the officer gave

20   instruction for the dog to bite the individual with whom

21   he was struggling.

22           And the issue in this particular case was

23   whether the officer continued to allow or encourage the

24   person to be bitten after there was ample opportunity to

25   control him and after there was a clear indication that,

1  if he had been armed, he was no longer armed.

2      Q    So what was your opinion in the case?

3      A    That the officer did not -- did not cause the

4  dog to release from the bite in a reasonable and timely

5  manner, and, in fact, had allowed the dog to -- allowed,

6  and perhaps even encouraged, the dog to continue to bite

7  for some protracted period of time that was not

8  reasonably necessary to control this particular

9  individual.

10     Q    And you were retained by the plaintiff in that

11 case?

12     A    I believe that on that case the city brought me

13 in as an independent evaluator.  I know the city sent me

14 to their insurance -- well, I don't know that for sure.

15     Q    But do you recall if you were retained by the

16 plaintiff in the case?

17     A    I don't.

18          MR. SHEARMAN:  Object to the form.

19          You can go ahead and answer if you know there

20 was a plaintiff.

21          THE WITNESS:  I don't know.  You know, I'm

22 trying to remember who it is that actually paid me.  I

23 know that the city and its attorneys -- after I was

24 first brought in to the case, the city and its attorneys

25 worked out some kind of an arrangement with counsel in

1   the case that I would speak to them about my evaluations

2   of the officer's conduct with respect to use of force.

3   That's really the best I can tell you.

4       Q   (BY MR. CAHALL)  Okay.  You mentioned you were

5   also -- you have also rendered an opinion that there was

6   excessive force used in another civil case as well.

7   What was that case?

8       A   Again, it's outside the four-year -- outside

9   the four-year window.  In that particular case, I do

10   recall the name of the city.  It was the City of Orem.

11   I don't recall who the -- I don't recall who the officer

12   involved was.

13         In that particular case, I was retained by the

14   city itself.  They first asked me to render an opinion

15   on the propriety of the officer's conduct.  They

16   terminated the officer.  The officer then turned around

17   and brought an action for wrongful termination, and I

18   was retained in that matter on the part of the city.

19       Q   And did that case involve the use of a K-9?

20       A   It did not.  It was a different type of force.

21       Q   Any other civil cases?

22       A   Well, not in which I have completed and

23   submitted a report.

24       Q   Okay.  And what about for criminal cases, you

25   mentioned there were times where you have rendered an

1    opinion in a criminal case that there was excessive

2    force used; is that correct?

3        A    That's correct.

4        Q    What cases?

5        A    I don't recall the officer's name.  It's been

6    quite some time.  Did not involve a K-9.

7            And I also will take this moment to interject,

8    I'm sure you have seen my CV as part of my report, so

9    you will know for a period of time in my career I was

10   the bureau chief of the Investigations Bureau for Peace

11   Officer Standards and Training, and in that role I dealt

12   with many, many cases where officers were accused of

13   excessive force, and my staff would investigate those

14   complaints in the context of administrative charges,

15   occasionally criminal charges.

16       Q    Did you ever investigate any of those cases?

17       A    Yes.

18       Q    Did you ever find that excessive force was used

19   in any of those cases?

20       A    Yes.

21       Q    More than once?

22       A    Well, more than once.  Again, I can't -- I

23   mean, there are a couple that pop to mind just because

24   of the nature of the case, but certainly more than once.

25       Q    In any of those cases did you find excessive

1  force was used with a K-9?

2      A    No.  None of those -- none of those cases ever

3  involved a police service dog.  The only -- yeah, the

4  only police service dog case I remember that was

5  specifically within my wheelhouse at that time, I wasn't

6  the main investigator.  I remember signing off on the

7  investigation and finding that the officer had acted

8  appropriately.

9      Q    In any of the cases listed in your expert

10 report, did you testify at a trial as an expert witness?

11     A    Well, I suspect so.  Let me look at the list.

12 Yes.

13     Q    Okay.  Which one or ones?

14     A    Castillo, C-a-s-t-i-l-l-o, versus City of

15 Tempe, Arizona.

16          Stoedter, S-t-o-e-d-t-e-r, versus Salt Lake

17 County.

18          Williams versus the City of Charlotte.

19          Texiera, T-e-x-i-e-r-a, versus the

20 United States of America.

21          And there has been one since then that's not

22 listed here.  United States of America versus -- the

23 defendant's name escapes me.  A criminal trial.

24          I'm sorry.  Did you ask about only civil cases?

25     Q    I did.

1          A      My error.  Sorry.  I went astray there.

2          Q      You don't need to apologize.

3                 What was the Texiera versus USA case about?

4          A      Texiera was a case involving a man attempting

5     to gain access to McClellan Air Force Base in Nevada.

6     He was stopped by non- -- well, he was stopped by

7     private security officers employed by the government,

8     but they were not government agents specifically.  He

9     was denied access.  There was a fuss.  He made a phone

10    call, and the Air Force security police dispatched

11    police units, Air Force police units, to the man's

12    location.

13                He ended up striking one of the -- I don't

14    recall who he hit first, but I know that at some point

15    he struck an Air Force airman.  And at that point, the

16    airman's dog bit the defendant -- well, in that case he

17    was the plaintiff -- bit the plaintiff/former defendant

18    and took him to the ground.

19         Q      And you rendered an opinion for the

20    United States, correct?

21         A      Yes.  Well, the Air Force.

22         Q      I want to talk about your background.  I know

23    you have listed a lot of your credentials in your expert

24    report, but I really want to go through kind of a

25    chronology with you.

```
 1              Where did you attend high school?

 2        A     High school?

 3        Q     Yeah.

 4        A     Well, I started in West Des Moines, Iowa, and

 5    concluded in -- well, it was an unincorporated area.  It

 6    now is known as Cottonwood Heights, Utah.

 7        Q     And do you recall the year you graduated in?

 8        A     I believe I was part of the class of '75.  I

 9    actually completed high school early, and I think '74

10    was the last year I attended.

11        Q     And then did you go directly to an

12    undergraduate university?

13        A     I worked for some period of time.  I don't

14    recall how long.  But ultimately enrolled at the

15    University of Utah.

16        Q     And was that work in between high school and

17    the university law enforcement work?

18        A     No.

19        Q     And what degree did you obtain from the

20    University of Utah?

21        A     None.

22        Q     Did you transfer to a different university?

23        A     I did.

24        Q     And when did you transfer?

25        A     In the late '70s or early '80s.
```

1     Q    What university did you transfer to?

2     A    Brigham Young University.

3     Q    And did you obtain a degree from Brigham Young?

4     A    I did.

5     Q    What was your degree?

6     A    Public administration.

7     Q    After you obtained your degree in public

8  administration, did you go straight to law school?

9     A    No.

10     Q    Did you work in any law enforcement positions

11  in between obtaining your degree and going to law

12  school?

13     A    I did.

14     Q    Okay.  What was your first position in law

15  enforcement?

16     A    Well, I worked for a private provider in our

17  state's big hospital system.  My first public employment

18  position was at Brigham Young University.  Back then it

19  was known as security police.  Now I think it's called

20  BYU Police Department.  I did that while I was attending

21  school.

22        Then transferred to the Provo City -- Provo is

23  the city where BYU is located -- Police in 1982.

24  Continued to dabble in undergraduate studies.  I

25  think -- I don't remember how long it took me to get my

1  undergrad degree.  Quite some time.  Stayed at Provo

2  City Police until late in 1987 when I entered law

3  school.

4      Q    What was your first position with the Provo

5  City Police?

6      A    Well, I worked as a dispatcher, but that

7  really, I think, was, if I recall correctly, concurrent

8  with my employment as a patrol officer.

9      Q    Were you a patrol officer the whole time you

10  worked with the Provo City Police?

11      A    That was my rank.  I had different assignments.

12  I had some investigative assignments, but officer was

13  the rank.

14      Q    Did you work for a K-9 unit with that

15  department?

16      A    I worked with our K-9 unit until it was

17  disbanded.

18      Q    Were you a K-9 officer in that unit?

19      A    No.  I was an agitator.

20      Q    Okay.  What does an agitator do?

21      A    An agitator is often referred to -- and in

22  Florida you hear the term more commonly used, "decoy," a

23  person who participates in laying a track, if it's a

24  tracking exercise, or taking bites, training -- helping

25  train the dog.

1    Q    And were you providing any training

2  instruction?

3    A    No.  Not at that point.

4    Q    So then you stated you began law school in

5  1987?

6    A    '87?  Yes.

7    Q    What law school did you attend?

8    A    J. Reuben Clark at Brigham Young University.

9    Q    When did you graduate from that law school?

10   A    Spring of 1990.

11   Q    And when did you pass the bar exam in Utah?

12   A    Shortly after graduation.  Whenever the first

13 bar exam was administered.  I don't know.  It would have

14 been the spring of 1990.

15   Q    Are you currently licensed to practice law in

16 any other states?

17   A    I don't know.  I'm not sure.  I may still be

18 licensed in Texas, but I don't -- if I am, I'm in

19 inactive status.

20   Q    Okay.  Have you previously been licensed in any

21 other states besides Utah and Texas?

22   A    Well, I was admitted to the bar of the Fifth

23 Circuit Court of Appeals, which brought privileges in

24 Texas.  So in Federal Court, would have been admitted in

25 federal practice in Mississippi and Louisiana, but I

1    never practiced as an advocate in those states.

2    Q    Okay.  So you have never been licensed to

3    practice law in Florida, correct?

4    A    No, I have not.

5    Q    Have you been retained to provide a legal

6    opinion in this case?

7    A    Well, insofar as qualitatively that means

8    opining on an ultimate legal issue, no.  I'm -- I have

9    seen other people in Federal Court try and give legal

10    opinions with a judge sitting on the bench, and it's

11    always an amusing event to me.  I don't do that.

12    Q    After you graduated law school, what was your

13    next employment position?

14    A    I did a one-year clerkship for a judge with the

15    Utah Court of Appeals.

16    Q    And after that?

17    A    I did a one-year clerkship for the -- a judge

18    on the Fifth Circuit Court of Appeals.

19    Q    What was your next position of employment?

20    A    I think that's when I came back to Utah and

21    started practicing at a law firm.

22    Q    Do you recall the name of that law firm?

23    A    Parsons Behle, B-e-h-l-e, & Latimer.

24    Q    And what was your position with the law firm?

25    Associate?

1      A      Associate.

2      Q      And what type of law did that law firm

3  practice?

4      A      The firm was, and I think still is, the largest

5  firm in the area, so they had an incredibly varied

6  practice.  My particular areas, I did some work in

7  criminal defense.  The majority of my work was in

8  employment law.  And did some work in cases involving

9  the blending of petroleum products.

10     Q      As an attorney with that firm, did you ever do

11  any civil rights cases?

12     A      I did.

13     Q      And did any of those civil rights cases involve

14  alleged excessive use of force?

15     A      No.

16     Q      How long did you work for that law firm for?

17     A      Two years.

18     Q      And then what was your next position of

19  employment?

20     A      I became, for a very brief period of time, an

21  assistant county attorney in Uintah, U-i-n-t-a-h,

22  County.  And shortly after commencing my work there was

23  appointed as the chief deputy in that office.

24     Q      All right.  And then what was your next

25  position of employment?

1      A      Full time?  You mean when I left Uintah County?

2      Q      Yes.

3      A      Well, there's a strange bridge there.  I left

4  Uintah County in -- sometime in 2001 or 2002.  I believe

5  it would have been 2002, but for a period of time, I

6  maintained two full-time positions as I was

7  transitioning.

8              I was doing some -- while I worked for Uintah

9  County, I was working for the Utah Department of Public

10  Safety part-time and had made a decision to transition

11  to a full-time position with them, and at about that

12  time there was a murder of a police chief in Utah.  And

13  I was the only person in the office at the time with any

14  experience in homicide cases, and so I stayed on to

15  prosecute that murder case.

16              So I don't know for how long I was working

17  essentially full-time for the county attorney's office

18  as well as the Department of Public Safety, and as soon

19  as I could transition to part-time with the county

20  attorney just to finish up that one murder prosecution

21  and work full-time for the Utah Department of Public

22  Safety.

23      Q      What was your position with the Utah Department

24  of Public Safety?

25      A      Initially I was the curriculum development

1    supervisor, and then later became bureau chief over the

2    Investigations Bureau at Police -- Peace Officers

3    Standards and Training, and then administrative counsel

4    for the department.

5        Q    What did you do as a curriculum development

6    supervisor?

7        A    Provided oversight to the curriculum for the

8    state's police academies.  I don't recall how many there

9    were at the time.  I want to say five or six.  Actually

10   developed curriculum in certain areas.  Delivered --

11   tested and delivered curriculum in a number of areas.

12            Helped evaluate the performance of the police

13   academies around the state.  And occasionally --

14   occasionally provided nonpolice-academy training to

15   police entities.

16       Q    Did you establish any curriculum for K-9 law

17   enforcement units?

18       A    I did.

19       Q    And did that entail drafting policies and

20   procedures for those units?

21       A    Well, the police academy, although we had --

22   the Department of Public Safety had at the time a number

23   of police dogs.  I can't remember how many.  I want to

24   say a dozen or so.  So the department was able to

25   establish policy to govern the use of those dogs.

1          But insofar as people who would come to the

2     academy for training for their dogs and training as dog

3     handlers, or we also had an administrators course, they

4     would come for education and training, but their own

5     agencies would set policy for their particular agency.

6     We didn't -- I wasn't in a position to dictate policy to

7     those outside entities.

8          Q     And then what were your job duties as the

9     bureau chief for the Department of Safety [verbatim]?

10         A     Bureau chief of Investigations for Peace

11    Officers Standards and Training, which is a division of

12    the Department of Public Safety, and my role was to

13    oversee a number of investigators that investigated a

14    wide array of complaints about peace officer mis- --

15    alleged peace officer misconduct.

16         And for a period of time, I served as the

17    temporary bureau chief of the in-service training bureau

18    as well.  So for a while, due to financial constraints,

19    I wore two -- I had two bureaus under my command.

20         And in the second responsibility, I oversaw the

21    delivering of, not basic training -- that is, not police

22    academy training -- but in-service training in a wide

23    array of programs.

24         I oversaw the police service dog training unit,

25    a number of training programs related to mid-level

1   supervisor, officer advancement, the sort of programs

2   one would not expect to see in a basic training regimen.

3      Q   And are you still employed by the Utah

4   Department of Public Safety?

5      A   I occasionally teach for them, but I'm not

6   employed there.

7      Q   What classes do you teach?

8      A   It depends on what I'm asked to teach.  I still

9   teach from time to time a search and seizure course;

10  still teach in the K-9 handler's course, primarily in

11  the realm of use of force, search and seizure issues.

12  You know, there may be another course occasionally, but

13  that's the general scope.

14     Q   So when you are teaching the K-9 handler's

15  course, are you teaching the actual officers from

16  different law enforcement departments?

17     A   Correct.

18     Q   I saw you mentioned you were a former police

19  service dog handler with -- is it Uintah County

20  Sheriff's K-9 unit?

21     A   Uintah.  It's an Indian name.

22     Q   Okay.

23     A   Correct.

24     Q   Did you have a supervisor position in that K-9

25  unit?

1       A       I did not.  Are you asking if I was a

2   supervisor or if I had a supervisor over me?

3       Q       The former.

4       A       Yeah.  No, I did not serve as supervisor.

5       Q       Were you involved in training K-9 officers in

6   that role?

7       A       No.  Well, other than -- I was involved in

8   going to training and participating in training, but I

9   did not deliver training to other officers in that role.

10      Q       When you were a K-9 officer, did you have any

11  dog-bite apprehensions?

12      A       Yes.

13      Q       Did you monitor those apprehensions?

14          MR. SHEARMAN:  Object to the form.

15          You can go ahead and answer if you understand.

16          THE WITNESS:  I'm not sure what you mean by

17  "monitor."  Do you mean --

18      Q       (BY MR. CAHALL)  I will rephrase.  Did you keep

19  a total count of how many apprehensions you made as a

20  K-9 unit officer each year?

21      A       Oh.  I did not.

22      Q       Are you aware as to whether your department

23  did?

24      A       I'm -- I'm not aware.

25      Q       And did you monitor or keep track of your bite

1    ratio when you were an officer with that department?

2        A    No.

3        Q    Were any of your apprehensions done on suicidal

4    individuals?

5        A    No.  Well, in fairness, none that I knew --

6    none that I knew or reasonably believed to be suicidal.

7    They may have had that thought in their head, but not as

8    far as I knew.

9        Q    Okay.  And then I saw you had a position of

10   chief of law enforcement with the Utah Attorney General?

11       A    Correct.

12       Q    What did that position entail?

13       A    The investigation of the Office of the Attorney

14   General is the state's investigative entity.  It would

15   be similar to the investigative arm of the Florida

16   Department of Law Enforcement, at least as far as I

17   understand it.

18            That agency provided under my -- under my

19   command, and still does under my successor's command,

20   investigative services in a number of very specific

21   areas that are assigned to the Attorney General by

22   statute, as well as a wide variety of investigations

23   that fall into the category of public integrity whether

24   it is a law enforcement officer or an elected official.

25            Has a principal role in the investigation of

1   what we term as "officer involved critical incidents,"

2   which includes officer-involved shootings, in-custody

3   deaths -- that's what I was doing before I came here

4   this morning -- human trafficking, the state's cyber --

5   well, the internet crimes unit is located as part of

6   that entity.

7           There's a specific unit that deals with violent

8   and major financial crimes committed in the undocumented

9   community, the immigrant community.

10          Then there's a group known as "special

11  investigations" that provides investigative services to

12  other entities or other state agencies.  For example,

13  the county attorney may request a confidential

14  investigation and has the -- the county attorney has the

15  authority to ask the Attorney General to conduct an

16  investigation of almost any nature in her or his county.

17  To some degree, that may be true of a city.

18          So that's -- I think the best way for me to

19  summarize that, if you take out the FDLE's uniform

20  component, that's what that entity does.

21  Q    So in your -- is it the role that you

22  investigated excessive force cases, then, that we

23  previously talked about?

24  A    Well, during my tenure there, we did have

25  excessive force cases, and I can think of one in which I

1    directed the investigation where we charged an officer

2    for a crime related to excessive force.

3              But when I was referring to overseeing

4    investigations of excessive force on a more frequent

5    basis, that was as the bureau chief of the Investigation

6    Bureau of Peace Officer Standards and Training.

7              Two different roles, similar, but the Attorney

8    General would only -- typically only investigate an

9    allegation of excessive force that was believed to be or

10   likely to be resulting in criminal charges.

11             Or -- or there's also small statutory category.

12   The Attorney General's office in Utah also is the

13   principal investigative agency for allegations of civil

14   rights violations, not in the context of Section 1983

15   litigation, but in the context of, if you, for example,

16   claimed that you were struck by a police officer and

17   that the animus was because of your ethnicity or your

18   religious background, that narrow category of

19   investigations also fell into our wheelhouse.

20        Q    You referenced there was a time where you

21   recommended charging a police officer with a crime

22   related to excessive force; is that correct?

23        A    That is correct.

24        Q    What had that police officer done?

25        A    There was a shooting, and an officer was shot.

1  The -- a number of officers attempted to find the

2  suspect.  A couple officers did find him and pursued

3  him.  And at the end of the pursuit, the suspect was --

4  there was a significant amount of force used on the

5  suspect after he was contained and secured.

6      Q    And was a K-9 involved in that case?

7      A    No.  That -- guns and fists and feet.

8      Q    Why did you retire from your position with the

9  Attorney General?

10      A    Money.

11      Q    Does that mean you had enough money or they

12  weren't offering you enough money?

13      A    No.  I -- I'm a very wealthy man.  No.  I had

14  spent a number of years paying into a pension system,

15  and the only way to take money out of the pension system

16  was to be retired.

17          And at the same time -- I didn't -- I didn't

18  really -- it was in my five-year plan.  I, in fact, had

19  just been -- the chief of investigations in Utah is a

20  political appointment.  I had just been appointed --

21  reappointed by the third Attorney General in a row, and

22  looked like things -- that's what I would be doing for a

23  long time.

24          But someone with whom I had a consulting

25  relationship made an offer that was very generous and

1    very, very attractive, and I could both take my pension

2    and work in the private sector for more money than I

3    ever made.

4        Q    Okay.  And so where are you currently employed?

5        A    The sign on my door at my office says:

6    Ken Wallentine, failed retirement.  I am -- I work at

7    the same place from where I retired.

8            I spent the mandatory cooling-off period

9    outside of public employment.  The new Attorney General

10   wanted to launch a very intriguing initiative.  We had a

11   lunch conversation.  He said, "Hey, why don't you come

12   back and do this and we will make it fun."  So I'm right

13   back where I was, at the Attorney General's office,

14   although in a very different role.

15       Q    What is your role now?

16       A    I operate a training center that is kind of

17   unique.  It includes a virtual reality center, so a

18   pretty high-tech -- a pretty high-tech training program,

19   as well as delivering -- unlike Florida, Utah is a small

20   state.  We have fewer than 3 million people in probably

21   the same amount of real estate, maybe even more.  And so

22   we also do distance learning, which is fun for us.

23           And then I have a role in training and

24   mentoring officer-involved critical incident

25   investigators.

1        And so that's -- I don't know that that's a

2   passion, but it's a great interest of mine,

3   officer-involved shooting investigations, and so that's

4   what I do now.

5        Q    And did you develop this new training program?

6        A    The concept actually was the brainchild of the

7   Attorney General himself, and he provided the funding

8   and provided the direction.  I certainly have had, I

9   think, the yeoman's share of development work, but the

10  credit for the concept really rests with the Attorney

11  General.

12       Q    Any of the training involve the use of K-9,

13  with police dogs?

14       A    Very tangentially.  We do have -- we have some

15  very limited ability to provide a virtual reality

16  experience with K-9s.  We don't do it much.

17       Q    I think you also mentioned that you supervised

18  the fleet service dog training and certification program

19  for the State of Utah.

20       A    I do not now.  I did once.

21       Q    I'm sorry.  It may have been unclear, but I

22  said you did --

23       A    Yes, I did.  I did.

24       Q    Okay.  What did your supervision consist of in

25  that role?

1      A      Well, ultimate command oversight of the

2   trainers that delivered the training, the facility where

3   the training was conducted, although I didn't really put

4   too many of -- too much of my hand on the curriculum, I

5   had responsibility for the curriculum that was

6   delivered.

7          The certification programs, if you went and,

8   you know, completed a training program there during that

9   time, mine would be the signature that would be on your

10   certificate.  And certainly spent some time in the

11   classroom or the field with those who were in that

12   course of instruction.

13      Q      And when you were in the field with them, were

14   you training them in the field or actually going on

15   active calls?

16      A      I was -- pretty -- I was in a command-level

17   position at that point.  It would have been pretty

18   unusual for me to go on an active call.  There would

19   have been a few, and I suspect sometimes I wished I had

20   not been there.  But no, this was primarily in a

21   training role.

22          Mr. Cahall, when you get to an appropriate

23   point, I'm going to ask you if I can step down the hall

24   for a couple of minutes.  I'm a little bit horse, so I

25   have been drinking water.

1          MR. CAHALL:  Yeah, that's fine.  Let's take

2    five.

3          THE WITNESS:  Five minutes work for you now?

4          MR. SHEARMAN:  Yeah, it sure does.

5          (Break was taken.)

6    Q     (BY MR. CAHALL)  What's the Utah Law

7    Enforcement Academy?

8    A     So the Utah Law Enforcement Academy is the

9    principal academy for the state.  However, not all, in

10   fact, the minority of new officers attend that academy.

11         There were -- at the time when I was the

12   curriculum development supervisor and then had other

13   positions at the Department of Public Safety, there

14   were, I believe, five other academies in the state,

15   which all operated under permission of and governance of

16   the Utah Law Enforcement Academy.  Now I believe there

17   are ten throughout the state.

18         But the Law Enforcement Academy is both an

19   entity that oversees all law enforcement training

20   provided by a government entity in the state of Utah, as

21   well as a physical location, similar to a college

22   campus, where many officers actually come for training.

23   Q     Do officers in the state of Utah have to get

24   certified as K-9 officers before they can be an active

25   duty K-9 patrol officer?

1    A    They do not.  The state's -- the standards for

2  certification in Utah are not mandatory.  They are

3  advisory only.

4    Q    Do K-9 officers in Utah have to complete

5  academic courses in K-9 training?

6    A    If they wish to achieve certification, they do.

7    Q    Otherwise they wouldn't?

8    A    Otherwise they wouldn't.

9         Now, I hasten to say that I'm not aware of any

10  police entity in the state that uses uncertified dogs or

11  uncertified handlers.  But in fairness to your question,

12  it is theoretically possible.

13   Q    Okay.  And if a K-9 officer wanted to obtain

14  certification, would he or she do so through the Utah

15  Law Enforcement Academy?

16   A    That would be the typical route, but it would

17  be possible, for example, if one could secure -- if one

18  could secure training in another state, it would be

19  possible for one to attend some other police training

20  facility somewhere else and then take the certification

21  exams in Utah not having actually trained in Utah.

22   Q    And I believe in your report you mentioned that

23  you have actually drafted K-9 policies that law

24  enforcement agencies use, correct?

25   A    That is correct.

1     Q    Are you aware as to whether any of the policies

2   that you have drafted are in use by any Florida law

3   enforcement agencies?

4     A    I am aware.

5     Q    Which ones?

6     A    I couldn't begin to tell you.  Lots.

7     Q    Could you name any?

8     A    I really can't.  You know, I spent a couple

9   weeks in Florida last year visiting with a number of

10  them, but I couldn't.  Let me explain.

11      So I work -- I was recruited by a friend of

12  mine to leave public employment a couple years back, few

13  years back when I retired.  And I went to work full-time

14  for a company known as Lexipol.  Lexipol is the nation's

15  largest public safety, risk management consulting firm.

16      And one of its -- well, its principal product

17  is to provide policy services for law enforcement

18  agencies, including K-9 policies.  And as part of its

19  work, Lexipol has a strong presence in a couple of dozen

20  states.  I don't -- I couldn't tell you at this point

21  how many states, but one of those is Florida.

22      And so there are a number of agencies in

23  Florida that are Lexipol clients.  We have a number of

24  staff people there, legal staff and subject matter

25  staff.  And so there are dozens and dozens and dozens of

1    Florida agencies that retain Lexipol to actually draft

2    the policy manuals, including police service dog

3    policies for their police agencies.

4        Q    Are you aware as to whether the City of North

5    Port policy is one that you drafted?

6        A    It is not.

7        Q    Do you know who did draft that policy?

8        A    Well, no.

9        Q    Your policies in this organization vary from

10    policy to policy depending on what jurisdiction they are

11    used in?

12        A    Yes.

13        Q    And do you have one uniform model policy that

14    is used by all the Florida law enforcement agencies that

15    you drafted?

16        A    There would be a master policy for a particular

17    state that would be developed in consultation with that

18    state's subject matter expert, that state's legal

19    experts, and then prescribed as a template for each

20    individual agency.

21        But that -- the agency may choose to change

22    elements of the policy.  They may choose to reject that

23    particular policy and use all hundred and some-odd other

24    policies and completely author their own policy in a

25    particular area, as well as they would select

1    components.

2          For example, in my current position, my current

3    full-time position with the Attorney General's office,

4    we utilize K-9 services that include a polycarbonate

5    detector dog.  That's a very rare kind of dog.  The dog

6    is used to locate hidden -- hidden storage media when

7    executing a search warrant for child pornography.  And

8    so the policies governing that kind of dog are going to

9    be different than the policies that would govern, for

10   example, a patrol service dog.

11         So an agency may say, "Okay.  Well, I want that

12   particular segment of your policy product, but I don't

13   want that particular segment."

14   Q     Is there a place where the Florida master

15   policy that you draft is located?

16   A     There is.

17   Q     Okay.  Is it published on a public web site?

18   A     It is not.

19   Q     If I wanted to take a look at that policy,

20   where would I find it?

21   A     I don't think that you would.  It's

22   proprietary.  I mean, the company's -- the company's

23   stock and trade is intellectual property, and so they

24   protect that intellectual property pretty vigorously.

25   Q      You analyzed the City of North Port's K-9

1  policy, correct?

2      A    I reviewed it.

3      Q    When you reviewed it, did you make a

4  determination as to whether it conforms with your -- all

5  the policies for Florida that you drafted?

6      A    Certainly the language does not match word for

7  word, but the components that need to be there, in my

8  opinion, are there.  It bears hallmarks that one would

9  find in a number of policy templates, whether they are

10  produced by the company for which I work or by the

11  National Sheriff's Association or International

12  Association of Chiefs of Police, as well as others.

13      Q    Have you ever drafted a K-9 training log

14  template?

15      A    I have participated in helping a man prepare

16  such a device.  He was trying to develop a -- develop

17  and market a computer template.  I'm not a computer

18  person.  Not -- I mean, I'm still amazed at this

19  technology.  But I have worked on one, but I haven't

20  ever drafted one myself.

21      Q    And what specific law enforcement

22  certifications do you hold?

23      A    I'm certified as a law enforcement officer in

24  the state of Utah currently.

25      Q    Do you have any K-9 certifications?

1     A     None current.

2     Q     When you say "none current," does that mean you

3 previously were certified in K-9 use?

4     A     Yes.

5           THE REPORTER:  I'm sorry, you cut out.

6     Q     (BY MR. CAHALL)  Oh, I asked, what agency --

7           MR. SHEARMAN:  Don, you cut out for me as well

8 there briefly.

9           THE WITNESS:  Are you there?

10    Q     (BY MR. CAHALL)  Yeah.  I'm just checking my

11 WiFi.  I'm showing I have a full signal.  Am I still

12 cutting out?

13    A     You are much better now.

14    Q     Okay.  What I was asking is, who provided you

15 your K-9 certification?  What regulatory agency?

16    A     It wasn't a regulatory agency.  It was a

17 provider -- private provider, the International Police

18 K-9 Conference.

19    Q     And what does that conference do?

20    A     They provide training as well as testing and

21 certification services.

22    Q     So what did you have to do to get your K-9

23 certification with that conference?

24    A     Attend a -- one of their -- well, on an annual

25 basis, one of their certification trials.  They refer to

1   them as trials, not trial in the sense that you are

2   familiar with in the legal world, but performing a

3   number of tasks with a police service dog and

4   successfully completing those tasks to a particular

5   standard.

6       Q    How many hours' worth of training did you have

7   to do to obtain that certification?

8       A    Well, have to do?  I don't -- I don't know that

9   I can answer that question.  The basic training

10  consisted of, I think it was about four weeks.

11          But when you say to achieve a certification,

12  it's -- a dog's skills, as well as a handler's skills,

13  are perishable, so it's not one and done.  In other

14  words, one would have to recertify periodically.

15          I believe in Florida the requirement is annual.

16  Many of the -- there are a number of certifying

17  entities, and most of them, I believe, it would be fair

18  to say they are annual.  How many hours it takes to

19  achieve that on an annual basis, that's going to depend.

20      Q    When you recertify, is it another four-week

21  course?

22      A    No.

23      Q    What does it consist of?  An examination?

24      A    It's a trial or an examination.  There's not --

25  typically after the initial certification, there's not a

1  written exam.  It's a performance trial, a performance

2  examination.

3      Q    And does that consist of you having your dog

4  complete certain training tasks in front of an

5  evaluator?

6      A    It's usually -- yes.  At least one evaluator.

7  Typically -- typically two.  And when you say the dog,

8  it's the handler and the dog.  The certification isn't

9  for the dog alone.  It's for the handler and the dog

10  together.

11      Q    Do dogs individually have their own

12  certification?

13      A    Yes.  But not typically in the police world.

14      Q    Have you previously had any other law

15  enforcement certifications?

16      A    Yes.  Well, I have been certified for many,

17  many years as a law enforcement officer in the state of

18  Utah.  I also keep up, for whatever reason -- I was

19  certified as a correctional officer in Utah.  I maintain

20  that certification by keeping up with the required

21  in-service hours for -- I'm not entirely sure why, but I

22  do.  If you lose it, it's hard to get back.  Having

23  achieved it, I don't want to give it up.

24          And then I also am currently certified as a

25  federal officer as a deputy United States -- a special

1    deputy United States marshal.  And that's -- that dates

2    back a little more than a year and then I was inactive

3    for a couple years, and before that I served for a

4    number of years as a special deputy United States

5    marshal.

6         Q    You said you did serve as a deputy for the

7    United States marshal?

8         A    Special deputy.

9         Q    What is a "special deputy"?

10        A    So they are -- many entities, including the

11   office of the Attorney General, will have particular

12   task forces, and the task force may cross jurisdictional

13   bounds.  The authority of a special agent for the

14   Attorney General in Utah is limited, obviously, to the

15   state of Utah.

16             Some entities, and ours was one of them, engage

17   in a cooperative agreement with the United States

18   Marshal that certain of our agents who qualify may be

19   deputized as federal officers so that they have the

20   ability, the legal ability, to enforce federal law to

21   cross state lines in the course of investigations and

22   make arrests extraterritorially; that is, across the

23   United States.  Had nothing to do with dog work,

24   however.

25        Q    I see that.

1          Have you ever trained K-9 officers in the state

2    of Florida?

3        A    Yes.

4        Q    For what law enforcement agency?

5        A    It was the Orange -- couple of times.  The

6    first time, I believe, that it was the Orange County

7    Sheriff's Office that put on a six-day course and

8    invited me to come and be one of the trainers.

9          And when I say "the Orange County Sheriff's

10   Office," they had -- oh, there were 50 or so, maybe even

11   more, K-9 officers.  So they were from a region.  Other

12   than Orange County, I don't know.

13         And then a couple of times have been brought in

14   to Florida by the Lake County Sheriff's Office.  Again,

15   a very similar context.  Wasn't just Lake County

16   deputies, but deputies and officers from other entities

17   around the state.

18       Q    And were you providing training in the field,

19   or was it academic training?

20       A    I was doing both, but my principal focus was

21   providing the legal training during the afternoons in

22   the break between the morning field training and the

23   evening field training.  And then when my work was done

24   at the end of the afternoon, I would participate in the

25   evening field training typically as an agitator or the

1    person receiving bites from the dog.

2        Q    What academic courses did you train these

3    deputies on for the Orange County Sheriff's Office?

4        A    Well, my work consisted primarily of two

5    different courses.  One had to do with detector dogs,

6    primarily narcotic detector dogs.  And so we had a

7    couple of days where we concentrated on the laws of

8    search and seizure, how to testify in court and not --

9    and to communicate properly, not use improper jargon or

10   vernacular, effectively communicate in the course of

11   your testimony.

12            And then the second part of the week -- or it

13   may have been reversed.  I can't remember which we did

14   first -- we had a law of deployment course in which we

15   talked about circumstances where it's appropriate to use

16   a dog, to even begin deployment of a dog, and then

17   circumstances where it was appropriate to allow the dog

18   to be engaged in force, so courses where it was

19   appropriate to bite.  And talked about all kinds of

20   legal issues related to the deployment of patrol service

21   dogs.

22       Q    What regulatory bodies regulate K-9 officers in

23   the state of Florida?

24       A    My understanding is the only regulatory body

25   with regulatory authority is the Florida Department of

1    Law Enforcement.  Well, I mean, you could make the

2    argument that a local entity regulates its own in that

3    context.

4        Q    Have you ever worked for the Florida Department

5    of Law Enforcement?

6        A    I have not.

7        Q    Have you ever provided any consulting to them?

8        A    I have had representatives of that entity in

9    workshops that I have conducted, but not -- I wasn't

10   retained by them.  They were invited by other people to

11   the table.

12       Q    Are there any other universal standards for K-9

13   officer training?

14       A    Yes.  Well, I'm sorry, I should not have

15   answered so quickly.

16            Can you define "universal" a little better for

17   me, because that can be pretty darn broad, and we could

18   get into Europe.

19       Q    I agree.  Sure.

20            Are there organizations, either public or

21   private, in the U.S. that set guidelines for K-9

22   training?

23       A    Yes, there are.

24       Q    What are the names of those organizations?

25       A    Well, there are a few nationally known

1  organizations. I will give you the abbreviation, and

2  for the reporter, I'm going to spell those out.

3           There's the USPCA. Hang on just a minute.

4           Can you hear that? There's a train going by.

5           The USPCA, the United States Police Canine

6  Association. That's likely the largest.

7           There's also the NDDA, the National -- NNDDA,

8  National Narcotic Detector Dog Association.

9           There's the American Police -- North American

10 Police Working Dog Association, often referred to as

11 NAPWDA.

12          Those are the three principal organizations

13 across the United States. And then there are some, such

14 as the Heartland Police Working Dog Association -- there

15 are regions where you will have a regional entity. For

16 example, there's the California Narcotic and Explosive

17 Detector Dog Association. The name would suggest it's

18 limited to California, but I believe they certify dogs

19 as far away as -- well, I know they certify dogs in

20 Ohio, and possibly even Florida, and I know they do a

21 number of certification trials in Texas.

22          So in terms of national groups, I have given

23 you the three big ones, but there are more.

24     Q    And other than training, do those big three

25 groups provide model K-9 policies for law enforcement

1  departments?

2      A    Well, you may find -- you may find some

3  materials on their web sites, but that's not their --

4  that's not one of their principal roles, to provide a

5  model policy.

6      Q    Is there an agency that does have a principal

7  role of providing model policies for law enforcement

8  departments?

9      A    There are agencies that provide model policies,

10  such as the International Association of Chiefs of

11  Police or the National Sheriff's Association, a few

12  others.

13      Q    To your knowledge, are K-9 officers in the

14  state of Florida bound by any different types of

15  regulations than K-9 officers in the state of Utah?

16      A    Yes.

17      Q    What are those different regulations?

18      A    Well, when you said "different types," there's

19  different types of regulations.  The -- so I have

20  examined in times past the certification trial

21  requirements from the FDLE; in other words, I have

22  looked at the actual forms and witnessed an actual

23  certification in Florida.

24          That would be -- if you were to transport that

25  certification form to Utah, it would be very, very

1    similar.  Very similar.  But the difference is in

2    Florida an officer must achieve that certification

3    before the entity, the police agency or the sheriff's

4    office, can use that dog.

5            In Utah it's a best practice, it's prescribed,

6    there's some social pressure to do it, but it's very

7    different in the sense that there's no -- and it is also

8    administered by the state.  But there's no penalty,

9    there's no regulatory authority to require that to

10   happen.  It's just voluntary or peer pressure.

11       Q    Have you ever been trained by the USPCA?

12       A    I have been to a couple of USPCA training

13   seminars over the years.

14       Q    Did those training seminars relate to K-9 --

15       A    They did.

16       Q    And what about for the NNDDA?

17       A    I presented for the NNDDA.  I don't know that I

18   have ever -- I don't know that I have ever gone to --

19   you know what?  I do.  I think I have attended one that

20   was co-hosted with Colorado and the NNDDA.

21       Q    (Inaudible) like K-9 training with those

22   organizations?

23       A    I'm sorry.  I didn't hear that.

24       Q    Was that K-9 training with those organizations?

25       A    Yes.  Yeah, they would not have -- I would not

1   have attended any seminars other than K-9 training with

2   those associations.

3       Q    All right.  I want to get into your report and

4   I want to start off by asking you some questions

5   regarding your synopsis of the facts in this case.

6       A    All right.

7       Q    You mentioned, "Mrs. Landon told officers that

8   plaintiff had recently gone through a divorce and that

9   his ex-wife had accused him of assault by allegedly

10  stabbing her with a screwdriver."

11          Did you take that statement from her witness

12  statement?

13      A    I don't recall.  There are no -- I can tell you

14  this.  There's nothing with respect to what I believe

15  Mrs. Landon to have said that was not contained in

16  materials she provided to the officers.

17          Hang on just one second, if you would.

18          (Off the record.)

19          THE WITNESS:  Sorry.  There was a glare on your

20  face.

21          MR. SHEARMAN:  That looks better from this side

22  as well.

23      Q    (BY MR. CAHALL)  So are you unsure as to where

24  you received that information about Ms. Landon?

25      A    I couldn't point to a particular document right

1   now and tell you where I received that information.

2      Q    Are you aware as to whether Ms. Landon told any

3   of the responding officers to Mark Landon's incident

4   that he was -- that he was recently going through a

5   divorce and that his ex-wife had accused him of assault

6   prior to the dog bite apprehension?

7      A    I don't know -- I don't know at what point she

8   made that statement and I don't recall to whom she made

9   it.

10      Q    Are you aware as to whether any of the officers

11   that responded to Mark Landon's incident knew what his

12   past criminal history was prior to the dog bite

13   apprehension?

14      A    I'm not.

15      Q    In your report you state that, "After a brief

16   track, Officer Bush found Mark Landon laying under the

17   brush."

18        Do you know how long that brief track was?

19      A    Temporally or distance?

20      Q    Temporally.

21      A    I do not. Other than to characterize it as a

22   brief track.

23      Q    And are you aware of what position Mark Landon

24   was laying in when he was initially found by

25   Officer Keith Bush?

1    A    Not outside of what's been reported to me, that

2  he was laying on the ground facing away from the

3  officers.

4    Q    Are you aware as to whether he was laying on

5  his back?

6    A    My understanding is that he was lifted up on

7  his side, so it wouldn't be truly supine.

8    Q    And exactly what portion or parts of his body

9  were covered by the brush?

10    A    I couldn't tell you with precision what parts

11  were covered.

12    Q    Could you tell me generally?

13    A    Well, I could tell you they couldn't see his

14  hands, and having seen the photographs of the location

15  and being generally familiar with Florida underbrush,

16  that's going to depend on, you know, where he was

17  positioned at precisely at a particular moment.

18        So I can tell you that the officers reported

19  that they couldn't see his hands and that he was -- he

20  was in the brush and moved deeper into the brush, but I

21  couldn't give you a percentage of obscurity.

22    Q    Are you aware as to whether the responding

23  officers could ever seen Mark Landon's hands?

24    A    Well, they certainly did at one point, yes.

25    Q    And are you aware as to whether they couldn't

1    see his hands due to the brush?

2        A    Well, my understanding is that the principal

3    obstruction to seeing his hands was that he didn't place

4    them away from his body in a position they could be

5    seen, but certainly the brush would be a factor.

6        Q    So are you aware as to what portion of

7    Mark Landon's body was visible to Officer Keith Bush

8    when he first located him?

9        A    Yeah, again, I can't -- I can't give you with

10   any precision what Keith Bush actually saw.

11       Q    Do you have an opinion as to whether

12   Mark Landon intentionally concealed his hands from the

13   officers?

14       A    Well, I don't have any reason to believe that

15   Mr. Landon could not hear the officers and could not

16   comply.  I can't tell you what was in his mind and why

17   it was that he didn't present his hands at the time he

18   was asked to present his hands.

19       Q    Did you review Mark Landon's deposition

20   transcript in this case?

21       A    I did.

22       Q    Are you aware as to whether he was intoxicated

23   at this time?

24       A    There certainly has been reports that he was

25   intoxicated or under the influence of some substance.

1      Q     After Mark Landon concealed his hands from

2   Officer Keith Bush, how much time elapsed until he was

3   apprehended or bitten by K-9 Tomy?

4      A     Well, as is often the case, I don't have a

5   linear time track, so I can't -- I can't give you an

6   amount of -- I can't give you an amount of time.  I can

7   only relate to you the facts as they have been explained

8   to me.

9      Q     Are you aware as to whether Mark Landon ever

10  verbally threatened Officer Keith Bush?

11     A     I don't -- I don't believe that I saw that

12  anyone report that there was an actual threat toward

13  Officer Bush given verbally by Mr. Landon.

14     Q     Did Mr. Landon give any of the responding

15  officers a verbal threat?

16     A     I don't -- that hasn't been reported to me, or

17  if it has, it's not anything I recall right now.

18     Q     Are you aware as to whether Mr. Landon

19  physically threatened any of the responding officers

20  prior to the dog bite apprehension?

21     A     What do you mean by "physically threatened"?

22     Q     Did he physically attempt to harm any of the

23  officers?

24     A     Did he -- did he raise a fist to them or slash

25  at them with a knife or draw a gun or some other weapon?

1    If that happened, it hasn't been reported to me.

2        Q    Are you aware as to what Mark Landon's state of

3    consciousness was during the dog bite apprehension?

4            MR. SHEARMAN:  Object to the form.

5            You can go ahead and answer if you can.

6            THE WITNESS:  Well, I'm not a medical

7    professional.  I'm the -- I'm a dumb one in the family.

8    We have five doctors and a couple of cops.  I can't tell

9    you on a Glasgow Coma Scale, for example, where he

10   would -- where he would register.  I can only -- I can

11   only rely on the information that's been provided to me

12   in the various reports.

13       Q    (BY MR. CAHALL)  Okay.  Do you recall what

14   Mark Landon said in regard to his consciousness at the

15   time of this dog bite apprehension?

16       A    I know that he made some statement quite some

17   time later in his deposition, but I don't recall the

18   precise statement that he made.

19       Q    Do you know what that statement was in regard

20   to?

21       A    I don't.  I would have to go back and look at

22   his deposition.

23       Q    For purposes of your opinion in your expert

24   report, were you assuming that Mark Landon was fully

25   conscious during his dog bite apprehension?

1    A    I didn't know whether he was -- I'm not quite

2    sure what "fully conscious" means, and so I can't say

3    that.  I don't know with precision what his level of

4    consciousness was.  It appeared to me, based on his

5    conversations with the officers and with the medical

6    providers, that he certainly was capable of engaging in

7    discussion and conversation and reporting his condition.

8    So, you know that clearly requires some measure of

9    consciousness.

10          But, again, I can't tell you -- I can't give

11    you an empirical assessment of his level of

12    consciousness.

13    Q    What conversation do you recall Mark Landon

14    having with an officer?

15    A    I know that he conversed at the time the

16    medical providers were attending to -- attending to the

17    cuts that he had made.  I don't recall precisely who he

18    directed those comments to or precisely what he said,

19    only that he had an interchange with them.

20    Q    With medical providers, correct?

21    A    I'm pretty sure there were officers and medical

22    providers all in the assembly.

23    Q    Okay.  Can you name one officer that he had a

24    conversation with?

25    A    Again, I don't recall who said what as they

1    were -- as they were discussing his treatment and

2    condition.

3        Q    You state in your report that, "After the dog

4    bite, Officer Bush commanded Tomy to release plaintiff

5    and Tomy did so."

6             Are you aware as to whether Officer Keith Bush

7    physically took his dog Tomy off of the bite on

8    Mark Landon?

9        A    Well, I'm aware that Officer Bush gave a

10   command and that Tomy responded to the command.  It

11   wouldn't be unusual that Officer Bush would be in close

12   proximity and also have contact with Tomy.

13       Q    Well, how close --

14       A    I --

15       Q    How close was he in proximity to Mark Landon?

16       A    At the time that Tomy released the bite?

17       Q    Correct.

18       A    I don't -- I don't recall.

19       Q    Is it ever proper for a K-9 officer to

20   physically take a dog off of a bite?

21       A    Can be.

22       Q    In what circumstances can that be proper?

23       A    The dog can have multiple sensory inputs just

24   like a person can, and so there may be -- the dog

25   doesn't have the same cognitive processing ability that