1    you do, so there may be circumstances in which the dog

2    is receiving inputs or contextual cues that are at

3    variance, one with another.

4          For example, the dog may perceive that a

5    particular individual is attacking his handler or

6    another law enforcement officer, and the dog may be

7    engaged in protective behavior.  And if the dog is very

8    focused, is attending to that particular contextual cue,

9    it may be appropriate for the handler to physically move

10   the dog -- remove the dog from biting the individual.

11         There could be other circumstances, so

12   certainly there are -- there are contexts in which that

13   could be appropriate.

14    Q    Is that the general method that you trained

15   your K-9 officers in the past to use when they take a

16   dog off a bite?

17    A    No.

18    Q    Would it be improper for a K-9 officer to

19   always physically take his dog off a bite apprehension?

20    A    Generally a dog should respond to a verbal

21   command, to -- the term often used is "out" or "release"

22   from a bite.  There may be circumstances where it's

23   appropriate to physically perform a lift off or a

24   removal from a bite, but generally I wouldn't say that

25   that's a -- that there should be a dog where that's the

1    universal rule.

2        Q    Do you have an opinion as to whether an officer

3    is supposed to use the least amount of force possible to

4    take control over a mentally ill individual?

5        A    An officer should use that amount of force that

6    is reasonably necessary.  But you are presupposing

7    that -- a situation in which force is reasonably

8    necessary.  If no force is -- I mean, if a person will

9    comply with instructions, then no force would be

10   appropriate.

11       Q    If an officer is going to use force, are they

12   required to use the least amount of force possible to

13   obtain control over an individual?

14       A    Well, you're asking --

15            MR. SHEARMAN:  Objection.  Calls for a legal

16   conclusion.

17            But you can go ahead and answer to the best of

18   your ability and understanding.

19            THE WITNESS:  Well, as I started to say, you're

20   asking me a legal opinion.  And I can tell you that the

21   clearly established black letter law from the

22   Supreme Court and the law in all of -- all of the

23   circuits is that an officer should use that force which

24   is reasonably necessary.  Courts don't use that

25   language, "the least possible force."  That's just not

1    the state of the law in the United States of America, or

2    anywhere else, that I believe.

3           MR. CAHALL:  And just for clarity, I wasn't

4    asking for a legal opinion.  I was asking based on your

5    knowledge of K-9 use.

6           Bob, I would appreciate just a form objection

7    moving forward.

8           MR. SHEARMAN:  Well, I'm going to object and

9    say based on a legal -- that it calls for a legal

10    conclusion, but you can -- I understand.  You don't want

11    me to train the expert as to what he should say.

12           MR. CAHALL:  Exactly, because then he says,

13    "You're calling for a legal conclusion."  And my

14    understanding is that it's only proper to make form

15    objections.

16           THE WITNESS:  Well, I actually -- I actually

17    beat him to it.  That's what I was about to say anyway.

18      Q    (BY MR. CAHALL)  (Inaudible) to it, but I'll

19    move on with my questions.

20           Do you believe that the use of Officer Bush's

21    K-9 was the least amount of force possible to gain

22    control over Mark Landon in this incident?

23      A    No.

24      Q    What would a different level of force be

25    available?

1    A    If that incident --

2         MR. SHEARMAN:  Calls for speculation.

3         But you can otherwise go ahead and answer.

4         THE WITNESS:  Sure.  If that incident were to

5    have happened today at 9:00 in the morning 100 yards

6    from my office, I would have had at my disposal 70, 80

7    police officers and a number of highly specialized

8    police officers.  And the availability of a helicopter,

9    the availability of some specialized vehicles, including

10   all-terrain vehicles.

11        And in that particular circumstance, if I knew

12   that Mr. Landon was located within the woods behind my

13   office, I quickly could have established a perimeter.

14   There's a fence on the other end of those woods that

15   reasonably would prevent Mr. Landon from going over the

16   fence.  And we could have excluded people and stayed

17   for, you know, hours, days even, until he got hungry and

18   decided to come out.

19        Or we would use -- we could have called for

20   some technology that we have at a different location

21   that is thermal imaging and watched body temperature and

22   as the evening came on, there would be a certain point

23   where his body temperature would drop to a point that we

24   would feel comfortable in approaching him assuming,

25   again, that we didn't believe him to be armed with a

1    firearm.

2          So there are other theoretical and conceptual

3    approaches that could be taken.  But obviously --

4    obviously that -- you know, I doubt very much that

5    Officer Bush had 75 officers at his command and all of

6    the technology that I have just discussed.

7      Q    Well, do you know how many officers

8    Officer Bush did have at his command?

9      A    I would have to go back and look at the reports

10   and do a count, but I can tell you it certainly wasn't

11   anywhere near approaching the number of officers

12   required and the positioning of officers required to

13   establish a perimeter with a pretty high measure of

14   confidence, nor do I believe that there were physical

15   barriers that would have prevented Mr. Landon from

16   moving further into the bush or out of the bush on the

17   other side to a residential area.

18          I just -- I don't think that was -- I don't

19   think that was practical.  Theoretically possible given

20   a number of other resources?  Perhaps.

21     Q    Are you aware as to whether a perimeter was

22   established around Mark Landon's incident prior to the

23   dog bite apprehension?

24     A    I don't believe they had time to establish a

25   perimeter yet.

1    Q    Are you aware as to whether Mark Landon had a

2  firearm on him?

3    A    It has not been indicated to me that he had

4  one.  I don't have any reason to believe that he did.

5    Q    In your report you mentioned that, "A Taser

6  would not be an effective method to apprehend

7  Mark Landon because of -- the Taser cartridge are

8  significantly affected by wind and easily blocked by

9  light vegetation."

10      Are you aware as to whether it was windy when

11  this dog bite apprehension occurred on Mark Landon?

12    A    I don't know what the wind conditions were

13  like.

14    Q    Are you aware as to what type of vegetation was

15  covering Mark Landon?

16    A    I have seen pictures of the brush, and I'm

17  generally familiar with Florida brush.

18    Q    Do you have a -- have you seen a picture of the

19  location where Mark Landon was initially found by

20  Officer Keith Bush and his dog, Tomy?

21    A    I see the picture of what's been represented as

22  that location and the attendant vegetation.  Again, I

23  think one of your witnesses referred to it as "Florida

24  brush," which, as a generic description, is pretty

25  accurate.

1      Q      And you already mentioned that you don't know

2   exactly what part of Mark Landon's body was unexposed by

3   the brush.  Is it ever possible to taser an individual

4   when only part of their body is visible?

5              MR. SHEARMAN:  Form.

6              THE WITNESS:  It could be.

7      Q      (BY MR. CAHALL)  Are you aware as to how far

8   Officer Keith Bush was from Mark Landon when he first

9   located him?

10     A      You know, I can't give you -- I can't give you

11  any precise choreographing of his relative position at

12  that point.

13     Q      How far can a Taser shoot?

14     A      Well, that -- it depends on a number of

15  factors.

16     Q      Based on your experience as a law enforcement

17  officer, is it possible to tase somebody who is 15 feet

18  away?

19             MR. SHEARMAN:  Object to form.

20             You can go ahead and answer if you can.

21             THE WITNESS:  Fifteen feet would be -- so let

22  me -- let me give you just a little help here,

23  Mr. Cahall.  When I say "it depends," it depends on the

24  technology in no small part.  Taser International sells

25  cartridges for different applications, different

1   clothing types.  For example, in Utah, you might buy a

2   very different cartridge than you would in Florida.

3          Those cartridges have different lengths of very

4   thin wire.  I don't have much hair.  I can see that you

5   and Mr. Shearman are blessed.  But some of the hairs on

6   your head are actually thicker than Taser wires.

7          So when I say it depends, it depends on the

8   length of the connecting wires.  It depends on -- the

9   farther they travel, the more susceptible they are to

10  interference by environmental conditions; that is, wind

11  or brush.

12         But 15 feet typically would be at the very

13  outside of an effective distance.  A Taser instructor in

14  class typically would tell students that 7 to 12 feet is

15  the optimal average distance for a deployment under

16  ideal conditions.

17         So 15 feet, you are getting out there in the

18  best of circumstances.  And it may well be -- I don't

19  know what cartridges these officers had.  It may well be

20  that they didn't have cartridges that were even capable

21  of accurate -- delivering accurate, effective hits at

22  15 feet.

23         And then, you know, when I say "accurate" and

24  "effective," there's a panoply of considerations into

25  whether the Taser would be effective at that distance.

1      Q     (BY MR. CAHALL)  Based on your training as a

2   law enforcement officer, is a Taser considered an

3   intermediate level of force?

4      A     Well, when you say "intermediate level of

5   force," what immediately comes to mind is a rather

6   lengthy series of discussions in cases in the

7   Ninth Circuit of Appeal, and to me that's a almost

8   purely legal term, so --

9      Q     Fair enough.  And I don't want you to get into

10  the legal analysis.  I just didn't know if it's

11  enumerated as an intermediate force in a typical police

12  policy or not.

13     A     I wouldn't use that terminology in a policy.

14  Whether others do or not, I couldn't say.

15     Q     When you train officers, do you categorize

16  different weapons into different groups of levels of

17  force?

18     A     We talk about what different tools or different

19  weapons are capable of doing under best circumstances

20  and then all the gradients of circumstances.  I don't

21  try and establish a value; that is, give a scale and

22  say, "This" -- you know, "This is equivalent to 15 on

23  this scale of 1 to 30," or anything like that.

24           So I think the answer to your question is no.

25     Q     You are a Taser expert; is that correct?

1      A     Well, I have offered testimony as an expert

2    witness in the deployment of using Tasers, and I have

3    been certified as a Taser instructor on a number of

4    cases.

5      Q     Do Tasers generally inflict less harm than a

6    K-9 during an apprehension on an individual?

7      A     Typically a Taser would result in less visible

8    injuries than a dog bite.

9      Q     You say in your report that, "Overwhelming

10   Mark Landon with numerous officers approaching him and

11   grabbing his limbs would violate time honored and proven

12   principles of not going hands-on."

13           "Not going hands-on," is that a principle

14   that's discussed in any literature that you reviewed in

15   preparation of your expert report in this case?

16     A     Not that I reviewed specifically for this case,

17   no.

18     Q     Where is that term discussed?  Any

19   publications?

20     A     Well, you can do a Google search for the term

21   "hands on," or there are a number of -- of analogous

22   terms that refer to the possibility of using sheer

23   weight to overwhelm a person, and one would hope,

24   effectively take him into custody.

25     Q     When is it prudent for a law enforcement

1  officer to decide to use force on an individual?

2      A    Well, as a general rule, it would be prudent to

3  make that decision when it appears that force may be

4  necessary.

5      Q    Is it ever prudent to make that decision prior

6  to encountering an individual?

7      A    It could be.

8      Q    Are you aware of a difference between active

9  and passive resistance?

10     A    I have heard those terms.

11     Q    How would you define "active resistance"?

12     A    Active resistance is someone using some form of

13  resistance that is either physical, that is physical in

14  a confrontational assaultive sense, striking out;

15  physical as in the context of attempting to escape,

16  twisting and torquing away, rolling away, crawling away,

17  running away.  It may be physical in the context of

18  tensing muscles and refusing to present arms behind the

19  back or put arms -- hands on top of the head.

20         It may be active in the context of -- for

21  example, there were recently a number of protestors

22  confronted at a town hall with a congressman here in

23  Utah, who decided to hold arms together and not -- not

24  leave when ordered to leave.  Many people would define

25  that as active because they are physically undertaking

1   an action or refusing to undertake an action when given

2   a contrary direction.

3           That's -- I mean, when we use that -- when we

4   hear that term "active resistance," that's one of the

5   challenges with the term, is that it's used so very

6   differently by so many different people, including law

7   enforcement trainers.

8   Q     Are you aware as to whether the Florida

9   Department of Law Enforcement has a definition for

10  active resistance?

11  A     I don't recall whether they do or not.

12  Q     Do you have an opinion as to whether

13  Mark Landon was exhibiting any active resistance to

14  Officer Keith Bush prior to the dog bite apprehension?

15  A     Well, applying the definition that you just

16  asked and received from me, he certainly was.

17  Q     What active resistance was he using?

18  A     Well, he didn't comply with the direction to

19  present his hands so that the officers could see his

20  hands and make a rudimentary threat assessment based on

21  the position and the contents of his hands, whether he

22  was holding anything or not.

23          By moving away from them and further concealing

24  his hands and actually increasing the difficulty for

25  them to perform a threat assessment and then ultimately

1 take control of him so that he could be detained and

2 then provided with medical and potentially mental health

3 treatment, that certainly was active resistance within

4 the context of what I have just described for you.

5 Q Did Mark Landon say he rolled away from the

6 officers when they asked him to show them his hands?

7 A I think that in his deposition sometime later

8 he said that he did not, but I don't recall specifically

9 what he did say.

10 Q Could it be difficult to show your hand if you

11 your wrist was severely cut?

12 MR. SHEARMAN: Object to form.

13 You can go ahead and answer if you can.

14 THE WITNESS: Well, that question would be

15 better -- better presented to Dr. Wallentine down the

16 street, who is an orthopedic surgeon.

17 But I have -- I have seen someone present an

18 arm where the hand and the forearm were nearly entirely

19 severed. So, yeah, it certainly can be done. And from

20 what I understand of human physiology -- and again, I'm

21 not a medical expert by any stretch -- but from what I

22 understand of human physiology and what I have seen, the

23 answer is yes.

24 I mean, I have been involved in a man -- a

25 fight with a man, who had a gun in his hand and was

1    trying his utmost to shoot me in the face at close

2    range, and his arm was broken, his wrist was broken.

3    But he was so very determined to kill me that he

4    worked -- he worked through that physical impediment.

5        Q    (BY MR. CAHALL)   Are you aware as to whether

6    Officer Keith Bush was told that Mark Landon had a knife

7    prior to the dog bite apprehension?

8        A    I don't know at what point he heard about the

9    knives that were involved.

10        Q    Do you recall as to whether Officer Keith Bush

11    attempted to locate a knife on or near Mark Landon prior

12    to the dog bite apprehension?

13        A    I know that he scanned the area.   Whether he

14    was intently focused on locating a knife away from

15    Mr. Landon's body, that I can't tell you.

16        Q    How did he scan the area?

17        A    Visually.

18        Q    Did he walk around, after locating Mark Landon,

19    to get a different visual viewpoint of Mark Landon?

20        A    I know that -- I know that officers -- after

21    Mr. Landon was being attended to by the emergency

22    medical personnel, I know that officers looked in the

23    area and did not find a knife.

24        Q    Respectfully, that's not what I'm asking.   I am

25    asking if Officer Keith Bush located Mark Landon and

1    then attempted to get a different viewpoint of

2    Mark Landon to see if he had a knife.

3        A    Oh, I'm sorry.  I thought you said after he was

4    in custody.

5            That I don't know, sir.

6        Q    Are you aware as to whether it was daylight or

7    dark out at the time of this dog bite apprehension?

8        A    It was described in the reports as approaching

9    dusk.

10       Q    Are you aware as to whether Officer Keith Bush

11   attempted to use his flashlight to better see

12   Mark Landon and whether he may have a knife?

13       A    I'm not.

14       Q    What about Officer Murges?

15       A    I don't recall whether he did or not.

16           (Off the record.)

17       Q    (BY MR. CAHALL)  Do you know whether

18   Mark Landon was moved after the dog bite apprehension?

19       A    Yes.

20       Q    Where was he moved to?

21       A    He was placed first on a -- I think it was

22   referred to as a gurney or a stretcher, and then taken

23   to an area -- and I don't recall whether he was first

24   put in the back of an ambulance or a helicopter.  I

25   think it was an ambulance and then a helicopter, if I

1    remember correctly.

2         Q    Do you know if an officer moved Mark Landon

3    after the dog bite apprehension?

4              MR. SHEARMAN:  Objection.

5              You can go ahead and answer if you can.

6              THE WITNESS:  Yeah, I believe he was turned.

7    In terms of actually transporting him, I don't believe

8    so.

9         Q    (BY MR. CAHALL)  I want to show you a

10   photograph.  Are you able to see this photograph?

11        A    I can.

12        Q    Do you recognize this photograph?

13        A    It's one that I -- well, it appears to be a

14   printout of the pictures that I have seen and that are

15   on this disk here.

16        Q    Okay.  I'm going to make this Exhibit 1.

17        A    While --

18        Q    I'm sorry.  Go ahead.

19        A    While you're figuring out how to do that with

20   the reporter, I'm going to step down the hall, if that's

21   okay with you.

22             MR. CAHALL:  Yeah, that's fine.

23             All right.  I'll just scan this and e-mail it

24   to the reporter (inaudible), if that's fine?

25             MR. SHEARMAN:  Yeah, that's okay.

1          (Break was taken.)

2     Q    (BY MR. CAHALL)  In this photograph --

3          THE REPORTER:  I'm sorry, you cut out.  "In

4    this photograph..."

5     Q    (BY MR. CAHALL)  I said, are you aware as to

6    whether that's Mark Landon lying on the ground?

7     A    Well, I believe that it is.  It's been

8    represented to me that that was a photograph of

9    Mark Landon.

10    Q    Okay.  And do you know how long after the dog

11   bite apprehension this photo was taken?

12    A    I do not.

13    Q    Does Mark Landon appear to be conscious in this

14   photograph?

15    A    I can't really tell whether he is or not.

16    Q    Does he appear to be awake?

17    A    I can't tell.  I can't see his face.

18    Q    Based on this photograph, does Mark Landon

19   appear to be a threat to the officers that are

20   surrounding him?

21    A    From what -- from what I can see, I don't see

22   that he is holding a weapon, and I don't see that he is

23   engaged -- of course, you know, it's a still photo -- I

24   don't see that he is engaged in any overtly threatening

25   behavior at that point.

1    Q    Why would it be prudent for an officer to point

2  a Taser near Mark Landon in this picture?

3    A    Well, there could be a variety of explanations.

4  I don't know what Mr. Landon is about to do, and I

5  suspect neither did the officer who had the Taser

6  pointed to the ground.

7    Q    Does he look like he is about to do anything?

8    A    Again, it's a still photo and I don't know

9  what's in his head at that moment, or at any moment for

10  that matter.

11    Q    Are you aware as to whether another officer was

12  pointing a gun at Mark Landon at the time of this

13  photograph?

14    A    I can't see what any other officer is doing and

15  I don't know.

16    Q    Did you review the deposition transcript of

17  Officer Stevie Connell?

18    A    I did.

19        I can't remember how to spell that either.

20        MR. CAHALL:  This is going to be Exhibit 1.

21        (Exhibit 1 was marked.)

22    Q    (BY MR. CAHALL)  In Section 1(b)(1) of your

23  expert report you reference the International

24  Association of Chiefs of Police model policy.  I know

25  you referenced that organization previously.  Do you

1    have a copy of that policy with you?

2         A    I do not.

3         Q    Do you recall the date of the policy by that

4    organization that you reviewed?

5         A    I don't.  I don't believe that the police

6    service dog model policy has changed for several years,

7    but I don't know, sir.

8         Q    I have a copy of a model policy dated May 2015.

9    Do you recall if you've reviewed a model policy from

10   that agency from May of 2015?

11        A    I probably have.  But I can't tell you that I

12   have seen that particular policy, but it's very likely.

13        Q    Attached to the policy I have is a -- what's

14   titled a "concepts and issues" paper.  Are you familiar

15   with that paper?

16        A    Well, the ICP publishes a number of model

17   policies as well as a number of concepts and issues

18   papers.  I -- that's a -- that's a term and a type of

19   white paper they have been putting out for many, many

20   years.

21        Q    Do you know if there was a concepts and issues

22   paper attached to the model policy from that

23   organization that you reviewed?

24        A    I don't recall.

25        Q    Are you a member of the IACP?

1    A    Yes, I am.

2    Q    What do you have to do to become a member of

3  that agency?

4    A    I don't recall what the -- what the command

5  level threshold is, but there's a fairly simple process

6  where one is nominated by someone else.  It's almost --

7  almost certain that a chief -- and I was for many, many

8  years, a chief executive officer of a law enforcement

9  agency, a state agency -- a chief of a state, county, or

10  city police agency would typically be admitted to

11  membership in the United States.  There's different

12  rules for other countries.

13          However, it's my understanding that other

14  command level officers may be admitted to -- there are

15  different levels of membership.  Full membership

16  typically is chiefs, captains, lieutenants,

17  command-level people.

18    Q    Do you have a copy of the policy you reviewed

19  from this association in that disk that you have?

20    A    I do not.

21    Q    You mentioned that the model policy states that

22  K-9s are used to track missing persons, correct?

23    A    I -- I believe I said that.  That certainly

24  sounds like something I wrote.

25    Q    Okay.  Do you recall what portion of the model

1    policy or what section that's under?

2        A    I don't.

3        Q    Does the model policy from this association

4    discuss using a K-9 to apprehend a missing person?

5        A    I don't believe so, but -- I can't recall any

6    specific language to that effect.

7        Q    Do you recall if that model policy cites a

8    U.S. Supreme Court case named -- or a case styled

9    Graham v. Connor?

10       A    I can't tell you if it does or if it does not,

11   but I would not be surprised if it does.

12       Q    Are you familiar with that case?

13       A    Yes.

14       Q    Is that a case that's used to train police

15   officers on use of force?

16       A    Certainly trainers are familiar with it.

17   Whether officers are taught the specific case name, that

18   I couldn't say.

19       Q    Do you recall what factors the court in that

20   case stated are reasonable to look at when an officer

21   uses force on an individual?

22       A    Generally.

23       Q    Can you generally state those for me?

24       A    Sure.  In Graham versus Connor the court spoke

25   about -- it was an arrest -- it wasn't a K-9 case --

1    arrest of a diabetic in Charlotte, North Carolina. And

2    the court talked about considering the degree of

3    criminality involved, that is, the crime that the

4    officers believed the person to be involved in; whether

5    the person was presenting a threat to self, officers,

6    public; and whether the person was actively attempting

7    to defeat an effort to take the person into custody or

8    to escape from custody.

9        Q    That third factor, defeat an effort to escape

10   custody or prevent custody, is that the actual language

11   the court used, or is that just your general

12   interpretation of the factors in that case?

13       A    Well, I don't think that's the actual language

14   of the court. It's language that I would have given

15   credit for when I was teaching criminal procedure at the

16   law school, so I think it's close enough. But I don't

17   think that's, by any stretch, a quote from the court's

18   opinion.

19       Q    Do you know if Mark Landon was ever the suspect

20   of a crime prior to this dog bite apprehension?

21       A    I don't -- I don't know what was in the

22   officers' minds or whether they characterized him as a

23   suspect in their minds.

24       Q    Well, have you seen anywhere in deposition

25   testimony that you reviewed that the officer thought

1   Mark Landon was a criminal suspect?

2      A    I don't believe so.  I don't think any of them

3   said that's what they were thinking before they dealt

4   with him, but I don't know exactly what they were asked,

5   but doesn't ring a bell.

6      Q    And to your knowledge, was Mark Landon ever

7   charged with a crime as it relates to this dog bite

8   apprehension?

9      A    I don't believe he was.

10     Q    Mark Landon wasn't attempting to resist arrest,

11  was he?

12     A    Yes.

13          MR. SHEARMAN:  Object.

14     Q    (BY MR. CAHALL)  How was he attempting to

15  resist arrest if he was never the suspect of a crime?

16     A    Well, perhaps more articulately I should say he

17  was attempting to resist the effort to take him in

18  custody, both by not complying with the officers'

19  direction to show his hands so they could perform a

20  threat assessment and decide what they should do next as

21  well as actively, physically moving away from them and

22  away from their view as they were dealing with him.

23     Q    As the K-9 officer, is it prudent to respond

24  differently to an individual who is a criminal suspect

25  than an individual who is not a criminal suspect?

1     A     As a general rule, that's certainly possible

2  and probably even likely.

3     Q     And when a K-9 officer is contemplating the use

4  of force on an individual, should he or she take into

5  consideration whether that individual is intoxicated?

6     A     If the officer knows whether the individual is

7  intoxicated and has some reliable -- reliable

8  information about how intoxicated and what the effects

9  of the intoxication are on that particular individual, I

10  would certainly think that would be advisable.

11     Q     Are you aware as to whether Officer Bush was

12  told by anyone prior to this apprehension that

13  Mark Landon was heavily intoxicated?

14     A     I don't recall at what point the statement was

15  made by Mr. -- and I don't know if I'm pronouncing this

16  correctly, sir, or not -- Madish or Madish (phonetic).

17  I don't know precisely what Officer Bush knew or had

18  been told about the type of intoxication and the level

19  of intoxication and how it was affecting Mark Landon.

20     Q     If an individual is intoxicated, are police

21  officers trained to know that that individual may

22  respond differently than someone who isn't intoxicated

23  to orders?

24     A     I think as a broad statement that's accurate.

25     Q     Are you aware as to whether the IACP references

1    whether officers should -- whether a K-9 officer should

2    handle intoxicated persons differently than

3    non-intoxicated persons when they are contemplating use

4    of force?

5    A    I believe there's some discussion in IACP model

6    policies with respect to dealing with chemically

7    impaired persons.  Where that discussion appears, I'm

8    not certain.  I don't know if that appears in the policy

9    language in the police service dog policy or not.

10    Q    Well, quite frankly, I would like to see a copy

11    of the policy that you reviewed in the preparation of

12    your final opinion in this case.

13    MR. CAHALL:  So, Bob, I don't know if that's

14    something you could e-mail me or not.

15    MR. SHEARMAN:  I can see about that.  I don't

16    have it, so --

17    MR. CAHALL:  He was supposed to bring it to the

18    deposition and he didn't, but --

19    MR. SHEARMAN:  Okay.  Do you understand my

20    response?  I can't e-mail it to you.  I do not have it,

21    but we will check into it.

22    MR. CAHALL:  Okay.  I'm just hoping I can get a

23    copy once he e-mails you a copy.  That's all.

24    Q    (BY MR. CAHALL)  And in subsection 1(b)(1) of

25    your report, you mention that, "Pete Madish reported

1  that he had wrestled one knife away from plaintiff.

2  Madish also told officers that the plaintiff had rearmed

3  himself with another knife before fleeing into the

4  woods."

5         Are you aware as to whether that statement from

6  Pete Madish was made to Officer Keith Bush or

7  Officer Murges prior to the dog bite apprehension?

8     A    I don't recall at what point -- what point

9  Mr. Madish said that.

10    Q    You reference the term "Baker Act" in

11  subsection 1(b)(4) of your report.  Have you ever

12  responded to Baker Act an individual?

13    A    No.

14    Q    Have you been trained in the procedures to

15  Baker Act an individual?

16    A    I have been told about how the Baker Act works

17  in Florida, but that's not the scheme here in Utah.

18    Q    Are you aware as to whether Mark Landon's

19  suicide call was originally considered a Baker Act call?

20    A    I don't know that.

21    Q    I know we briefly discussed the term "bite

22  ratio."  Is it prudent for a K-9 police unit to monitor

23  bite ratios of their K-9s?

24         MR. SHEARMAN:  Sorry.  Could you repeat that?

25  I think there's some other noise in the background of

1     some -- I'm not sure where it is, but it seems to be

2     obscuring the microphone.  I think that's the issue.

3     It's not in your WiFi connection.

4              MR. CAHALL:  Yeah.  It's not in my office, but

5     I hear it as well.  It sounds like cars or something

6     driving by.

7              THE WITNESS:  Yeah, it sounds like that to me,

8     too, but it's not here.  But anyway --

9              MR. SHEARMAN:  Okay.

10             THE WITNESS:  What was your question again,

11    Mr. Cahall?

12        Q    (BY MR. CAHALL)  Is it prudent for K-9 police

13    units to monitor bite ratios?

14        A    I don't -- I don't suggest to agencies that

15    they create some kind of mathematical formula like that,

16    so I would -- I think I would answer that no.

17        Q    And are you aware as to whether the City of

18    North Port monitored their bite ratio?

19        A    They monitored the activities of the K-9s,

20    which included when the K-9s had bitten someone and all

21    of their deployments.

22        Q    Do you know how many K-9 bites Tomy had in

23    2014?

24        A    I don't recall.

25        Q    Do you have that informations?

1     A     I believe that it's in one of the responses to

2     one of your request for production of documents.

3     Q     And if so, that would be included in your CD

4     that you have with you?

5     A     Yeah.  If it's on the -- if it's on the list

6     here on page 1 and 2, it's on the CD.  And I don't

7     remember which one, but I'm pretty sure it's in one of

8     your -- one of the city's responses to -- it may have

9     been interrogatories, but I'm pretty sure that I have

10    seen it in legal pleadings provided to you.

11    Q     Are you aware as to whether that figure was

12    higher than it was for the other K-9 officers with the

13    City of North Port?

14    A     I don't recall.

15    Q     I know you have obviously worked with a lot of

16    different law enforcement agencies.  Are you aware of

17    any that recommend using a bite ratio to monitor K-9

18    performance?

19    A     I'm not.

20    Q     Are you aware as to how a bite ratio is

21    generally calculated?

22    A     Well, no.

23    Q     If a police department has more dog bite

24    apprehensions on average than the surrounding cities,

25    would it be prudent for the chief of police to look into

1    the reason behind that?

2       A    Well, it certainly could be.  I mean, there are

3    a number of factors that would impact that analysis, but

4    certainly could be.

5       Q    How would you define the term "suspect" as it

6    relates to K-9 use of force?

7       A    Well, one of the challenges in many -- many

8    occupations and professions, vocations is the

9    imprecision of vernacular.  And certainly law

10   enforcement is no exception to that.

11          One of the challenges is that sometimes

12   officers will refer to a person as a suspect when

13   perhaps it might be more appropriate to say "subject."

14   Suspect generally suggests that there's at least some

15   threshold, however low that may be, to believe that the

16   person's been involved in criminal activity.  That's a

17   general answer to you.

18          But the challenge is different people use that

19   loose vernacular in different ways.  For example, we

20   spoke earlier about, you know, working for the defense.

21   Well, defense in -- you know, here I think I'm working

22   for the defense, but in a criminal case, defense means

23   something very, very different.

24      Q    Were you aware as to whether Mark Landon was

25   classified as a suspect prior to this dog bite

1    apprehension by City of North Port police officers?

2         A    I don't know what term they were using or

3    contemplating prior to the apprehension.

4         Q    You mentioned in Florida K-9 officers are

5    required to get a certification, correct?

6         A    That's my understanding, unless that's changed

7    very recently.

8         Q    Is that certification done through the FDLE?

9         A    Yes, it is.  They oversee that.

10        Q    And then after a K-9 officer received that

11   certification, are they qualified to become an active

12   duty K-9 officer?

13        A    All other things being equal, that's my

14   understanding.  You know, I'm assuming that nothing has

15   changed recently in Florida.

16        Q    Are you aware of any other certifications in

17   Florida for K-9 officers?

18        A    Well, there are different types of K-9s.  I

19   believe that Florida -- I don't recall whether they

20   certify accelerant detector dog teams or not.  I do know

21   that in Florida you see accelerant detector dog teams

22   working.  You see -- there are dog teams to detect the

23   importation of fowl; that is, parrots and the like.

24   Agricultural detector dogs.

25             I can't recall which of those require

1    certification by FDLE or not.  I do know that patrol

2    service dogs employed by -- or used by public entities

3    must be certified.

4        Q    How does one become certified by FDLE in

5    Florida for K-9?

6        A    Well, I -- I can only tell you that anecdotally

7    by what I have seen, and that is requesting that the

8    FDLE assign an evaluation team.  In my experience, from

9    what I have seen, it was two evaluators, who -- I don't

10   know, I suspect that they hold periodic certification

11   trials.

12            But I'm also aware that they have, at least in

13   the past, if there were a large number of handlers

14   engaged for a particular conference or training

15   competition, that FDLE has in the past sent certifying

16   officials to that event.

17            And then there are -- I don't know whether it's

18   by statute or administrative rule, but the FDLE has a

19   pretty standard -- I mean, you know what to expect if

20   you are a handler in Florida and you are going to a

21   certification trial.  You know what trials will be

22   administered and you go and they call your name and you

23   go take the test, essentially.

24       Q    Are you aware as to whether there's like a

25   certain hourly training requirement prior to being able

1    to be certified?

2        A    I believe there is, but I don't remember what

3    the threshold in Florida is.

4        Q    Are you aware as to whether any academic test

5    is administered prior to being able to be certified as a

6    K-9 officer?

7        A    You know, I have seen such a test, but I don't

8    know whether it's required by statute or rule.

9        Q    Are you aware as to how many hours of training

10   Officer Keith Bush completed prior to becoming certified

11   as the K-9 officer?

12       A    Boy, I have seen those records, but I can't --

13   that -- that's not something I can bring to recall right

14   now.

15       Q    After a K-9 officer becomes active duty, is it

16   prudent to continue to train with his or her K-9 dog?

17       A    Yes.

18       Q    Is there a specific hourly amount of training

19   that a K-9 officer should perform in their continuing

20   training per month?

21       A    There's a -- there is a general parameter with

22   some dependent variables.

23       Q    Okay.  Do you have an amount of time an officer

24   should train?

25       A    Most of the -- the larger entities recommend a

1   minimum of four hours per week, again, with some

2   dependent variables.  But that is typically a minimum

3   amount that would be recommended by the major certifying

4   organizations.

5       Q    And what type of training should that four

6   hours per week consist of?

7       A    Well, there's one of the dependent variables

8   that I mentioned.  It's -- it's going to depend very

9   largely on the -- on the individual mission of that

10  particular dog team.  For example, we are just down the

11  road here from a very large prison that has a very large

12  K-9 unit.  Those dogs train -- their dogs and handlers

13  train four to eight hours a week and they have very

14  specific tasks.

15          The dogs that are trained to do detection of

16  contraband in cells, that's where they will train.

17  That's where they will train.  They won't do any

18  training in patrol work.  And conversely, the dogs that

19  are trained to do crowd control with inmates and cell

20  extractions, that's what they will do.

21          So the dog's training should consist of that

22  set of tasks that the dog is certified to perform and

23  that the agency expects the dog to perform.

24          Now --

25      Q    Do you know -- I'm sorry.

1      A     I'm not quite done.

2            At the back end of that, you can have -- for

3    example, if you were to drive your car across the border

4    in Mexico, you would see dogs 24/7/365.  Those dogs

5    are -- they are working in their chosen and directed

6    profile four to -- typically about four hours a day.

7            So I wouldn't expect to see those dogs doing a

8    whole lot of maintenance training in that task they are

9    doing constantly.  So there are the two big dependent

10   variables for you.

11     Q     Do you know what types of roles K-9 Tomy was

12   used in?

13     A     Well, I know that he was used as a patrol dog,

14   and so I would expect that that's what I would see in

15   the training.

16     Q     Are you aware as to whether he was used as a

17   drug detection dog?

18     A     I believe that he had a secondary profile, but

19   I don't recall whether it was a detector dog profile or

20   not.

21     Q     Is it prudent for a K-9 officer to keep written

22   logs of his or her training per week?

23     A     That would be -- the best practice would be to

24   see a training log that reflected the training that was

25   done, whether that was on a weekly basis or a -- more

1  frequent or less frequent.

2      Q    And do you have an opinion as to whether --

3  when that training log should be completed?

4      A    Well, when it should be?  I don't know.  To me

5  it would be best -- my practice was to try and do it the

6  same -- the same night, the same day that the training

7  was accomplished just because that was easier for me.

8      Q    What types of information should be included in

9  a K-9 officer's training log?

10      A    Well, let's just talk about patrol dogs.  So

11  clearly the general scope of the training, is this

12  tactical obedience; that is, healing, doing recalls,

13  doing outs?  Is it building search training?  So the

14  general scope of what's being done.  It's more important

15  with a detector dog to have precision with respect to

16  the type of training and the substances used.

17          The hours performed, who participated, an

18  evaluation -- or an assessment of the dog's performance

19  and notation as to the notable positives and equally

20  important the notable negatives.

21          If there's something that -- if the dog, for

22  example, in Tuesday night's training was taken to the

23  local mall and put in an elevator -- there are certain

24  kinds of surfaces that dogs can get irritated on -- the

25  dog didn't perform well in the elevator surface, that

1   ought to be noted.  And then I would expect to see in

2   subsequent training records some addressing of that

3   issue.

4           In --

5       Q    I'm sorry.  Are you still answering?

6       A    Yeah.

7           In certain circumstances -- I mean, if you were

8   doing tracking, for example, or trailing, then there's

9   other things you would want to record, like ambient

10  temperature, wind speed, in some cases -- I'm not really

11  the guy to ask about this -- but in some places you

12  would want to record dew point and humidity.  So you --

13  it depends on what the dog's tasked to do.

14      Q    Do you recall the dates of the training records

15  that you reviewed for Officer Keith Bush and his dog,

16  Tomy?

17      A    I don't.

18      Q    Do you recall seeing whether there were any

19  periods of time where there were no training logs for

20  Officer Keith Bush or Tomy?

21      A    I think there were gaps, and I can't tell you,

22  you know -- it's been months and months since I looked

23  at those, so as I sit here, I can't tell you the

24  chronology of those records.

25      Q    Are you providing an opinion in this case as to

1   whether Officer Keith Bush was properly trained as a K-9

2   officer?

3       A    I haven't been asked that question yet.

4       Q    Is it prudent for a K-9 supervisor to sign off

5   on an officer's training log?

6       A    Well, you will see different gradations of

7   supervision.  Sometimes K-9 units will be -- in a large

8   agency, the K-9 supervisors are former K-9 handlers.  I

9   would expect to see that happen.

10          In police departments where that's not the

11  case, I would expect at least to see the supervisors

12  being aware that the training is being performed.  It's

13  going to be less important for them to sign off in the

14  context of saying, you know, this is what you should be

15  doing this week, this is what you should be doing this

16  week.

17      Q    I want you to take a look at this document.

18  Are you able to see this document?

19      A    It looks like a training log similar to those

20  that I have seen.

21      Q    Okay.  So this document -- can you see the date

22  of this document?

23      A    The date?

24      Q    Yes.

25      A    July 16, 2013.

1     Q    Do you recall if you reviewed this document?

2     A    I don't.

3     Q    And does this document specify who the K-9

4 handler is?

5     A    It says, "Keith Bush."

6     Q    And the dog?

7     A    Tomy, T-o-m-y.

8     Q    Okay.  I'm looking in my camera.  Can you

9 see -- can you read this document if I hold it this far

10 from the camera?

11    A    I cannot.

12    Q    Okay.  I want -- can you see the top half of

13 the document if I hold it this far?

14    A    Yes.

15    Q    Okay.  Can you just take a moment to read it?

16    A    Sure.  Done.

17    Q    And then the bottom half?

18    A    Yes.

19    Q    Okay.  I'm going to make this Exhibit 2 to the

20 deposition.

21        (Exhibit 2 was marked.)

22    Q    (BY MR. CAHALL)  Based on this record, are you

23 able to tell how long Officer Bush trained Tomy for

24 during this session?

25    A    No.

1      Q    Are you able to tell where the training took

2   place?

3      A    No.

4      Q    Is there any assessment of performance included

5   in this training log?

6      A    Not on that document.

7      Q    Are you aware of any other documents that

8   relate to this training session?

9      A    I suspect that there are, but I'm not aware of

10  them.

11     Q    Also, are there any notable positives or

12  negatives on this training record?

13     A    No.

14          MR. SHEARMAN:  I have got to take a really

15  quick break to use the restroom.

16          (Break was taken.)

17     Q    (BY MR. CAHALL)  Do you know who Officer

18  Keith Bush's K-9 supervisor was at the time of

19  Mark Landon's dog bite apprehension?

20     A    Oh.  Sorry.  A short name.  Can picture it in

21  my head, but no.

22     Q    And are you aware as to what -- as to whether

23  that supervisor monitored Officer Keith Bush's training?

24     A    I don't know what training sessions he was

25  present and when he was not.

1    Q    You mentioned some K-9 supervisors are --

2    A    Correct.

3        THE REPORTER:  I'm sorry.  Can I have you

4    repeat that?

5        MR. CAHALL:  You mentioned that some K-9

6    officers -- or supervisors are also K-9 officers; is

7    that correct?  And he said, "Correct."

8        THE WITNESS:  Yes.  That is correct.

9    Q    (BY MR. CAHALL)  Are you aware as to whether

10   Officer Keith Bush's supervisor at the time of the

11   Mark Landon incident was also a K-9 officer?

12   A    I don't recall.

13   Q    Do you know of any requirement that a K-9

14   supervisor also be a K-9 officer?

15   A    I'm not.  That's -- it would not be typical,

16   but I'm not aware of any requirement.

17   Q    Are you aware as to whether Officer Keith

18   Bush's supervisor physically responded to Mark Landon's

19   dog bite scene?

20       MR. SHEARMAN:  Object to the form.

21       You can go ahead and answer if you can.

22       THE WITNESS:  I'm not.  I don't remember.

23   Q    (BY MR. CAHALL)  Are you aware as to whether

24   Officer Bush verbally discussed his response to

25   resistance form with his supervisor after the

1   Mark Landon apprehension?

2       A    I'm not.

3       Q    You mentioned you did review Officer Keith

4   Bush's response to resistance form for the Mark Landon

5   dog bite apprehension, correct?

6       A    Yes, sir.  I did.

7       Q    You don't have a printed copy of that with you,

8   do you?

9       A    I don't.  I just have it on a disk.

10      Q    Are you aware as to whether the IACP model

11  policy for canines lists factors that should be included

12  in a K-9 handler's use of force report?

13      A    I believe so.  I'm seeing a paragraph in my

14  mind.  But I don't recall what the specifics of that

15  paragraph are.

16      Q    I have a model policy from the IACP with an

17  effective date of May 2015, and the policy states that,

18  "An on-duty K-9 supervisor shall respond to the scene of

19  any K-9 apprehension and review and evaluate the

20  handler's use of force report.  The report shall include

21  the following information."

22          I want to go through the list of information

23  that's enumerated in this model policy, and I want to

24  ask you if you recall seeing this stuff on Officer Keith

25  Bush's response to resistance report for the Mark Landon

```
 1   incident.
 2          Do you recall if Officer Keith Bush's report
 3   indicated whether the deployment of his dog, Tomy, on
 4   Mark Landon was approved by a supervisor or not?
 5     A    I don't recall.
 6     Q    Do you know if that's required based on the
 7   City of North Port K-9 policy?
 8     A    I'm sorry.  I can't remember.
 9     Q    Is it generally required?
10          MR. SHEARMAN:  Object to form.
11          The witness can go ahead and answer if he
12   understood the question.
13          THE WITNESS:  Yeah, that's going to depend on
14   the type of unit.  For example, that requirement is
15   going to be very different in Las Vegas than in, say,
16   Peoria, for example.  So I don't think that I can
17   generally say yes or generally say no.
18     Q    (BY MR. CAHALL)  Is that a requirement you
19   typically include in the policies that you have written?
20     A    Again, that's going to depend on the agency,
21   the size of the unit, the staffing of that particular
22   agency.  It's -- I mean, we see agencies where it may
23   well be that the only officer on duty is a K-9 officer,
24   so her supervisor may not even be -- may not even be
25   working.
```

1       Q    You said you have written a model policy for

2   the state of Florida.  Do you know if it's included in

3   that policy?

4       A    What -- what the company I work for provides is

5   a template.  We don't actually term it a "model policy."

6   And, again, that's an option that we leave to the

7   agency.

8       Q    I realize I didn't label this response to

9   resistance report as Exhibit 3, but I'm going to make it

10  Exhibit 3 and I will scan and send it with the other

11  exhibits.

12           (Exhibit 3 was marked.)

13      Q    (BY MR. CAHALL)  Do you recall if Officer Keith

14  Bush's response to resistance report specifies how many

15  verbal commands were given to Mark Landon prior to the

16  use of his dog bite -- or K-9 on Mark Landon?

17      A    I think it does, but I may be getting that

18  information from some place else, so I'm not sure.

19      Q    Okay.  Does the report specify how much time

20  elapsed between announcement and deployment of K-9 Tomy?

21      A    I don't recall.

22      Q    Does it specify how much time elapsed between

23  deployment and suspect for individual contact?

24      A    Again, I don't remember whether that's there or

25  not, sir.

1     Q    And does it say the distance that Keith Bush

2  was from Mark Landon when contact was made?

3     A    I believe that it does, but I am going to have

4  to also qualify that and tell you I may have gotten

5  information from another report.  But I believe that it

6  does.

7     Q    Well, do you know what that distance is?

8     A    My recollection is that it was around 15 feet,

9  but I'm not certain.

10     Q    Are you aware as to whether Officer Keith

11  Bush's response to resistance report describes the

12  duration of the K-9 contact with Mark Landon?

13     A    I don't think there's a temporal measurement

14  there, but I don't recall specifically.

15     Q    Are you aware as to whether the report

16  specifies how much time elapsed after the bite until

17  backup officers arrived?

18     A    No, I don't -- I don't recall.

19     Q    And are you aware as to whether the report

20  describes the manner in which the K-9 held Mark Landon?

21     A    I believe that that is contained there, and I

22  believe that's where I saw it.  But, again, I'm not

23  certain.  It's been some time since I reviewed that

24  report.

25     Q    And how was Mark Landon held by the K-9?

1      A      It was a single bite, single puncture bite.

2      Q      Do you know where the bite was?

3      A      I don't recall if I -- if I put the particular

4  lateral and medial.  And I don't recall whether I got --

5  where I got that -- where I got that information, so I

6  don't recall if it's there or not.

7      Q      Do you feel that the factors I just went over

8  with you are important to be included in a response to

9  resistance report?

10     A      Well, they are important -- they are important

11  factors.  Different agencies may choose to -- not all

12  agencies use a response to resistance report.  Some

13  agencies may use an incident report.  There may even be

14  times when the actor officer doesn't do a report, when

15  the actor officer is interviewed and someone else

16  completes the report.

17           I agree -- if you were to ask the question

18  whether those are important pieces of information, I

19  would agree with you, but, you know, I can't

20  conclusively say that that means they need to be in a

21  particular report.

22     Q      And do you know whether they are included in

23  the model policy you reviewed in rendering your opinion

24  in this case?

25     A      I don't.  I don't recall the specific language

1  of the IACP policy.

2      Q     Are you aware as to how much blood Mark Landon

3  lost after this incident occurred?

4      A     I wouldn't have any way of knowing blood

5  volume, no.

6      Q     Are you aware as to whether Mark Landon's

7  alcohol -- blood alcohol level was ever measured?

8      A     I don't believe it was.  I -- I don't recall

9  seeing that from medical records.

10     Q     I apologize if I already asked, but did you

11 review medical records in this case?

12     A     I reviewed -- give me just a second.  I think

13 it was -- I think -- I think there was an attachment to

14 one of the depositions that was like an emergency

15 medical services provider report or a helicopter crew

16 report.  I didn't -- I didn't review his treatment

17 records.  Well, beyond -- there was -- in -- there was a

18 very brief document from a mental health facility.

19     Q     Is that the one you referenced in your

20 report --

21     A     Yeah.  I -- you know, Mr. Cahall, I called it a

22 psychiatric evaluation.  I don't know that that's what

23 it was labeled.  That's what it appeared to me to be.

24     Q     Are you aware as to whether a psychiatrist

25 wrote that report or evaluation?

1      A     I don't recall, sir.

2      Q     I want to -- I want to hold up the concepts and

3   issues paper from the IACP so that you guys can identify

4   it, because I want to make it an exhibit to the

5   deposition.  So I am going to hold it in front of the

6   camera.  Are you able to see the document, at least the

7   title and everything?

8      A     Yes.

9      Q     And then attached to the back of it is the

10  model report policy that I have been referencing from

11  the IACP.  Can you guys -- can you read this policy, or

12  at least the portion that's visible?

13     A     It appears to be -- at least the format appears

14  to be a standard IACP policy dated May of 2015 related

15  to police canines.

16     Q     All right.  I'm going to make this Exhibit 4

17  and scan this in with the rest of the exhibits.

18           (Exhibit 4 was marked.)

19           MR. SHEARMAN:  Hey, Don, if you had planned to

20  use these, it would have been helpful to send them

21  beforehand so that I had a chance to actually look at

22  the exhibit, because now, under the format you are

23  using, I won't.

24           MR. CAHALL:  Yeah.  Well, he said he was

25  referencing this policy.  It's the most recent one, so I

1    assumed you had a copy of it, because it was in his

2    report.

3              MR. SHEARMAN:  No, I don't.

4              MR. CAHALL:  Well, he should have had it.  He

5    should have had it, not me.

6              MR. SHEARMAN:  If you are going to attach it to

7    the deposition, I want a copy or else I don't agree that

8    it's an exhibit, and I will move to strike it.

9              MR. CAHALL:  Okay.  Well, how about -- how

10   about I move to strike any portion of his report that he

11   relied on documents that he didn't bring?

12             MR. SHEARMAN:  Don, you can move whatever you

13   like.  This isn't tit for tat.  I'm telling you I didn't

14   get a copy of it, you are attaching it as an exhibit, I

15   am not agreeing to that.  You can move on and ask your

16   questions.

17             MR. CAHALL:  Okay.  So I'm assuming you won't

18   object if my next expert doesn't bring any documents to

19   the deposition?

20             MR. SHEARMAN:  Don, you can ask your questions.

21   I told you my position.  That's all.  Go ahead.

22             MR. CAHALL:  All right.  So I will attach it

23   and then you just file your motion to strike.

24             MR. SHEARMAN:  That's the way it works, Don.

25             MR. CAHALL:  All right.

1           MR. SHEARMAN:  (Inaudible) have to settle it

2    now on the phone or the video.

3           MR. CAHALL:  Would it help if I e-mail you the

4    policy, Mr. Shearman?

5           MR. SHEARMAN:  That would be wonderful.

6           MR. CAHALL:  Okay.  Can I -- I mean, I -- it

7    will just take a second if you want me to do it now.  I

8    mean, would you allow me to attach it as an exhibit?

9           MR. SHEARMAN:  That would be great, if I get a

10   chance to look at it.

11          MR. CAHALL:  I hope you know I'm not trying to

12   hide this from you obviously.  It's -- let me -- it's on

13   my other computer.  I'm on my laptop, so let me just go

14   ahead and -- let me just pull it up and e-mail it.

15          MR. SHEARMAN:  My point is, if there are

16   documents that you know you're going to use as an

17   exhibit in the deposition, if you can provide them

18   beforehand, that makes it easier for me to look at it,

19   the witness to look at it --

20          MR. CAHALL:  I totally understand that.  And

21   the only reason I didn't is because I thought it was

22   what he referenced in his report and I thought he was

23   bringing it, because that's what we agreed on the phone

24   that our experts were going to do.

25          And so I know it's not perfect and I'm not

1   having an issue with the fact that he brought a CD, but

2   that's the reason I didn't do it.  I'm happy to do it

3   now.  It's just going to take me a second to find it

4   real quick.

5           All right.  Mr. Shearman, I just e-mailed it to

6   you.  Let me know if you get it.

7           MR. SHEARMAN:  Yes.  Just came in.  Thank you.

8           MR. CAHALL:  Do you want to take a moment to

9   look at it before --

10          MR. SHEARMAN:  I think you can go ahead and ask

11  questions and I will take a look at it as we go.

12          MR. CAHALL:  Okay.

13          MR. SHEARMAN:  Thanks.

14      Q    (BY MR. CAHALL)  Mr. Wallentine, should

15  Officer Keith Bush have taken Mark Landon's possible

16  mental state into consideration when he was deciding

17  whether to use force on him or not?

18      A    Sure.  Whatever factors he knew or reasonably

19  believed were factors that should have been part of his

20  calculus, sure.

21      Q    How would someone's mental state affect an

22  officer's determination in using force on that person?

23      A    I don't know.

24      Q    Are you aware as to whether the IACP discusses

25  that issue?

1      A    There's recently been in the last five or six

2   months a pretty extensive discussion at IACP on

3   encountering emotionally disturbed persons and mentally

4   ill persons by first-line police officers.  So yes,

5   that's a topic of discussion.

6      Q    And in that topic have you studied whether

7   mentally distressed or ill individuals react differently

8   to police commands?

9      A    I certainly think there are some persons who

10  are suffering from mental illness and some persons who

11  are emotionally disturbed that react differently to

12  commands than other persons with such conditions, and

13  other persons without any such conditions.

14     Q    And knowing that, is there a general rule that

15  you should treat mentally ill people differently than

16  others?

17     A    No.

18          MR. SHEARMAN:  Object to form.

19          You can answer.

20          THE WITNESS:  No.

21     Q    (BY MR. CAHALL)  Are you aware as to whether

22  Officer Keith Bush knew of Mark Landon's mental state in

23  terms of whether or not he was depressed prior to

24  apprehending him with his K-9?

25     A    I don't know what he knew about any potential

1   depression or not.

2       Q    Are you aware as to whether Officer Keith Bush

3   knew of any blood loss that Mark Landon had sustained

4   prior to the dog bite apprehension?

5       A    I don't know that he knew how much, if any,

6   exsanguination had occurred.

7       Q    Are you aware as to whether he knew that

8   Mark Landon had cut himself at all prior to the dog bite

9   apprehension?

10      A    I believe that he was aware, but I don't know

11  if -- again, I don't know if he knew of the profundity

12  of the injury.

13      Q    Have you been retained to render an opinion for

14  the City of North Port on whether excessive force was

15  used on Danielle Drake?

16      A    I have been asked to discuss the Drake matter

17  with attorneys.

18      Q    Does that mean you haven't been retained yet?

19      A    I have not.

20      MR. SHEARMAN:  To the extent that you might

21  have had a discussion with a prior attorney representing

22  the City of North Port and that was as a consulting

23  expert, I would only not disclose to testify as a

24  witness but direct you not to answer.

25          I can't recall if you were -- if you rendered a

1    report and were preparing to testify, but if that's the

2    case, you can certainly go ahead and answer.

3           THE WITNESS:  I have not been retained in that

4    matter.  I have been consulted in that matter by another

5    attorney from another firm.

6       Q    (BY MR. CAHALL)  Did you prepare an expert

7    report for that matter?

8       A    No.

9       Q    What other attorney from another firm did you

10   speak with on that matter?

11      A    His first name was John, and I don't remember

12   what his last name was.

13      Q    Was he an attorney representing the plaintiff,

14   Danielle Drake?

15      A    No.

16      Q    Have you written an expert report regarding

17   whether proper force was used against an individual

18   named Tyler Langston by the City of North Port Police

19   Department?

20      A    I believe the answer is yes.

21      Q    And is that report final?

22      A    If it's the case I'm thinking of, the answer is

23   yes.

24      Q    Do you recall what your opinion is in that

25   report?

1      A    I -- no, I haven't looked at that in quite some

2    time.  And I'm not even -- I'm not even certain that

3    that's the case that I'm thinking of.

4      Q    So you are unsure of the general facts of that

5    case?

6      A    You know, I -- I don't -- I'm not, in my mind,

7    associating that name with a particular case, so as I

8    sit here, I don't recall.

9      Q    Okay.  What about for Jared Lemay?

10      A    I have been asked to consult in that case.  I

11    have not done any report in that case.

12      Q    Have you rendered an opinion in that case as to

13    whether you believe the City of North Port's use of

14    force was proper?

15      A    No, I have not.

16      Q    Is it ever proper for a K-9 officer to decide

17    to apprehend an individual with his or her K-9 prior to

18    ever arriving to the call?

19      A    Generally not, but it could be.

20      Q    What type of situation could it be?

21      A    There could be, for example, other officers who

22    are in foot pursuant communicating with the K-9 officer

23    who described the scene and provided the K-9 officer

24    with some sense that it's an appropriate circumstance

25    for a K-9 deployment.  I mean, you know, I would have to

1    sit here and think about different hypotheticals and

2    speculate on how they might unfold, but it could be.

3        Q    How does an officer determine if he or she is

4    in fear of their safety if they haven't even responded

5    to the scene of a call?

6        A    Depends on the information the officer has

7    about the call before they respond.

8        Q    So are you saying it's possible to know whether

9    you are in fear of your safety prior to arriving to a

10   police call scene?

11           MR. SHEARMAN:  Object to form.

12           THE WITNESS:  Absolutely.

13       Q    (BY MR. CAHALL)  Do you recall Officer Keith

14   Bush being punished by his department for sending

15   messages over his mobile digital terminal?

16       A    I recall there was some issue.  I don't know

17   whether discipline was imposed or not.

18           MR. CAHALL:  That's all the questions I have.

19           Bob, if you have no objection, I would just

20   like to get a copy of whatever is on his CD, assuming it

21   doesn't have any confidential --

22           MR. SHEARMAN:  Yeah, I think the CD was

23   prepared for you.

24           THE WITNESS:  Yeah.  This was done just for

25   you, Mr. Cahall.  And typically what I would do -- and

1    it depends on your rules there -- typically I would send

2    it to Mr. Shearman so that he has -- he can see what's

3    here and there's no -- you know, no question between the

4    two of you and then ask him to provide it to you.

5              MR. SHEARMAN:  However you all would like to do

6    it, that's fine with me.

7              THE WITNESS:  Well, that's how I would like to

8    do it.

9              MR. CAHALL:  That would be fine with me.

10             And then can you just also include, if

11   Mr. Shearman has no objection, the model policy from the

12   IACP that you have reviewed in your report?

13             THE WITNESS:  Yeah.  I will probably just

14   burn a -- it's sitting on my computer.

15             You know, just to be clear, I didn't review it

16   specifically for this.  It's not in the list of

17   documents that I reviewed specifically for this case.  I

18   do cite it and I cite a section with which I'm very

19   familiar.

20             But what I will do is probably just create

21   another CD and just ship it to you on another CD, and I

22   will label -- so this one is already labeled.  It says,

23   "Landon."  And then I will label one that says, "IACP."

24   I will send them both to Mr. Shearman, and then he can

25   communicate to you.

1              Is that acceptable?

2              MR. CAHALL:  That works for me.

3              MR. SHEARMAN:  Sounds good.

4              THE WITNESS:  Okay.

5              MR. SHEARMAN:  And, Don, I have no objection to

6    the policy that you sent.

7              MR. CAHALL:  All right.  Thank you.

8              THE WITNESS:  Or, you know, alternative, if you

9    want to e-mail that to me, I will take a look and see if

10   that's the same one that's on my computer.

11             MR. CAHALL:  I would rather you just send the

12   one that you believe you reviewed -- or referenced in

13   your report, I should say.

14             THE WITNESS:  Okay.

15             MR. CAHALL:  And then, Bob, do you have a

16   cross?

17             MR. SHEARMAN:  No.  I'm not going to ask any

18   questions.

19             And, Ken, as you know, you have got the right

20   to read the deposition.

21             THE WITNESS:  You know, we absolutely are in

22   the offices of the very best court reporters, and I have

23   worked with a lot.  Nonetheless, I do like to read and

24   sign.  Occasionally I find that I have stumbled over

25   words.  It's never the reporter's error.  But, yeah,

1    that's fine.

2           And then Mr. Cahall, I think I have your

3    address from the Notice of Deposition, so if it's

4    acceptable to you, I will just send you a PDF of the

5    statement.  I really am not a paper kind of guy, but if

6    you want, I can print it out and mail it to you on U.S.

7    mail.

8           MR. CAHALL:  No.  You can just e-mail it to me.

9           THE WITNESS:  Okay.

10          MR. CAHALL:  I will send these exhibits right

11   now after we conclude.

12          THE WITNESS:  Okay.  Thank you, sir.

13          (Discussion off the record.)

14          (Deposition concluded at 4:18 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

State of Utah        )
                ss.
County of Salt Lake  )


        I, Tamera Stephens, a Registered Professional
Reporter in and for the State of Utah, do hereby
certify:

        That the testimony of KENNETH R. WALLENTINE,
the witness in the foregoing proceeding named, was taken
on March 1, 2017; that said witness was by me, before
examination, duly sworn to testify the truth, the whole
truth, and nothing but the truth in said cause;

        That the testimony of said witness was reported
by me in stenotype and thereafter transcribed into
typewritten form;

        That the same constitutes a true and correct
transcription of said testimony so taken and transcribed
and that the said witness testified as in the foregoing
annexed pages set out.

        I further certify that I am not of kin or
otherwise associated with any of the parties of said
cause of action and that I am not interested in the
event thereof.

        WITNESS MY HAND at Salt Lake City, Utah, this
8th day of March, 2017.


                Tamera Stephens, RPR, CRR, CSR

Kenneth R. Wallentine
March 01, 2017

Page 128

```
1    Case:  Landon v. City of North Port
     Case No.:  8:15-cv-2272-CEH-JSS
2    Reporter:  Tamera L. Stephens, RPR, CRR, CSR
                Alpine Court Reporting
3                243 East 400 South, Suite B101
                Salt Lake City, Utah 84111
4
                     WITNESS CERTIFICATE
5
     State of Utah          )
6                           ss.
     County of _____  )
7
        I, KENNETH R. WALLENTINE, HEREBY DECLARE:  That I am
8    the witness referred to in the foregoing testimony taken
     on March 1, 2017; that I have read the transcript and
9    know the contents thereof; that with these corrections I
     have noted this transcript truly and accurately reflects
10   my testimony.
     PAGE-LINE          CHANGE/CORRECTION              REASON
11
12   ____ ____   _____   _____

13   ____ ____   _____   _____

14   ____ ____   _____   _____

15   ____ ____   _____   _____

16   ____ ____   _____   _____

17   ____ ____   _____   _____

18   ____ ____   _____   _____

19   ____ ____   _____   _____

20   ____ ____   _____   _____

     _____      No corrections were made.
21

22                  _____
                    KENNETH R. WALLENTINE
23   SUBSCRIBED and SWORN to at _____,
     _____, this _____day of _____, 2017.
24
                    _____
25                  Notary Public
```

Alpine Court Reporting
801-691-1000

**2**



# North Port Police Department
# K-9 Patrol Training Log

**Date**   07-16-13

**Handler:**   Keith Bush                    **K-9:**   Tomy

**Exercise Type:  Obedience:** heeling, finishes

**Exercise Type:   Articles:** heavy brush two articles key on ring and cellphone.

**Exercise Type:**

**Exercise Type:**

**Additional Comments:**

NPPD - 1201

DEF-00673

**3**



# North Port Police Department

## Response to Resistance Report

| | Print Form |
|---|---|

Date: 07-20-14    Time: 2037    Charges: Baker Act

Report # (Attach copy of Incident Report):  2014-07-1360

Officer's Name (print): Keith Bush                                                  ID #: 258

Witness: Ofc. Murges #322

Incident Location: 4232 Renova Avenue

Subject:  Mark J. Landon          Race:  White      DOB: 06-10-67      Sex:  Male

**Resistance by Suspect (check all that apply and describe):**

☐ None

☑ Passive    Upon initial contact subject was lying concealing himself in the brush not listening to verbal commands.

☑ Active    After given commands the subject rolled over turning his body away from Officers concealing his hands.

☐ Aggressive

☐ Deadly Force Resistance

**Response by Officer (check all that apply):**

Officer Presence: Uniformed  ☑ Yes ☐ No  Body Armor: ☑ Yes ☐ No  Unit Type: ☑ Marked ☐ Unmarked  Unit #: 71161

☐ Physical Control (describe):

☑ Non-lethal Weapon (describe):

Police Canine

☐ Deadly Force (describe):

☐ Additional Protective Restraint Devices Required (Hobble or other):

**Special Circumstances (check all that apply):**

☐ Felony Stop

☑ Suspect's Proximity to Weapon  (describe):   Subject was last seen running between the residences armed with a knife.

☐ Special Knowledge (subject's past behavior if known, i.e. resists arrest, assault on officer):

☐ Officer Exhausted (describe):

☐ Officer Knocked to the Ground  (describe):

☐ Officer Disabled or Injured (describe):

☑ Imminent Danger (was suspect armed or believed armed – describe):   Subject had cut himself prior to arrival with a knife that was wrestled away by a witness. But then the subject armed himself with another knife and was last seen running with the knife in hand.

ORIGINAL

Police Tactics/Equipment Used- (check all that apply):

- [ ] Personal Weapons (hands/feet/knees)  [ ] Chemical Spray  [ ] Expandable Baton
- [ ] Flashlight  [ ] Non-Lethal  [ ] ECD Displayed  [ ] ECD Deployed
- [x] Canine  Bite: [x] Yes [ ] No
- [ ] Firearm Pointed at Suspect – handgun/rifle/shotgun (describe): _____

- [ ] Firearm Fired– handgun/rifle/shotgun (describe): _____

- [ ] Device, i.e. spit, mask, hobbles (describe): _____

- [ ] Other – ticket book, clipboard, etc. (describe): _____

Contributing Circumstances (check all that apply and fill in any information that clarifies the Response to Resistance):

Age of Officer: 27   Hgt/Wgt of Officer: 6'0" 220lbs   Gender of Officer: Male

Multiple Officer: [x] Yes [ ] No  If yes, how many: 2   Age of Suspect: 47   Hgt/Wgt of Suspect: 5'8" 170lbs

Gender of Suspect: Male   Skill of Suspect: Unknown   Multiple Suspects: [ ] Yes [x] No  If yes, how many: ___

Injuries:

Were there any injuries?  [x] Yes [ ] No   [ ] Officer [x] Suspect

Was medical attention required?  [x] Yes [ ] No   [ ] Officer [x] Suspect

Explain injuries and treatment received:   Subject had cut himself on his arm prior to arrival with a knife.  Upon contact subject
received a Canine bite to the right stomach area.

Photographs taken of subject and injuries:  [x] Yes [ ] No

Narrative Summary  - briefly describe the incident (continue on page 3 if needed):

On 07-20-14 at approximately 2037 hours, I responded to the above listed address in reference to a suicidal subject (Mark J. Landon) armed
with a knife.  He was last seen wearing dark colored shorts and no shirt.  Upon arrival witnesses stated the subject was just seen running
between the residences armed with a knife.  They further stated the subject was bleeding from both arms where he had cut himself prior
to our arrival.

Submitted by (attach supplement if needed):

PFC. _____   258   07-20-14
Officer's Signature   ID#   Date

_____   078   7/21/14
Sergeant's Signature   ID#   Date   Within Policy* [ ] Yes [ ] No

ADMINISTRATIVE REVIEW AND APPROVAL

LT- _____   168   7-23-14
Lieutenant's Signature   ID#   Date   Within Policy* [x] Yes [ ] No

Further Investigation Required [ ] Yes [x] No

Refer to IA [ ] Yes [x] No

Division Level [ ] Yes [x] No

Remedial Training Required [ ] Yes [x] No

* Note: if not within policy, written explanation required.

At that time I deployed K-9 Tomy for a track. K-9 Tomy immediately began tracking northbound between the residences toward the backyards. We then entered a wooded area and continued tracking down a small trail. After approximately 50 yards I observed the subject matching the description lying in the brush concealing himself under palmettos. I could not see the subject's hands due to the brush. I began giving loud verbal commands for the subject to show his hands, which he did not. Again I began giving verbal commands this time stating "Police K-9, show your hands or I will send the dog". The subject this time rolled away from us onto his left side thus concealing his hands even more. Again I continued giving loud verbal commands to show his hands or I would send the dog. He again refused. Due to officer safety since the subject had been seen armed with a knife prior to our arrival and refusing to follow verbal commands to show his hands after multiple commands, I gave K-9 Tomy the command to bite. K-9 Tomy subsequently bit the subject in the right stomach area. I continued giving loud verbal commands to show his hands which he complied. K-9 Tomy was given the command to release which he did. The subject was taken into protective custody by back up officers.

North Port Fire Rescue responded and the subject was air lifted to Blake Medical Center. Photographs were taken and placed into property and evidence.

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MARK J. LANDON,

      Plaintiff,                          Case No.: 8:15-cv-2272-CEH-JSS

vs.

CITY OF NORTH PORT,

      Defendant.

_____/

## PLAINTIFF'S NOTICE OF TAKING DEPOSITION DUCES TECUM*

PLEASE TAKE NOTICE that the undersigned will take the deposition of:

| | |
|---|---|
| NAME: | Kenneth R. Wallentine |
| DATE: | March 1, 2017 |
| TIME: | 1:00 p.m. (Mountain); 3:00 p.m. (Eastern) |
| PLACE: | 2975 W Executive Parkway, Suite 236 |
| | Lehi, UT 84093 |

upon oral examination before Alpine Court Reporting or one of its duly authorized deputies. The deposition will be taken for the purposes of discovery for use at trial or for such other purpose as permitted under the applicable statutes. Deponent has been requested by Subpoena Duces Tecum to bring with him any and all items listed on the attached Schedule "A."

*Counsel for the Plaintiff and Defendant will be appearing via video conference.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 3, 2017, I electronically served the foregoing to the following: Vicki L. Sproat, Esq. and Robert Shearman, Esq., Henderson, Franklin, Starnes & Holt, P.A., 1715 Monroe Street, Fort Myers, FL 33902, Robert.Shearman@henlaw.com, courtney.ward@henlaw.com, Vicki.Sproat@henlaw.com and Lorraine.Zerner@henlaw.com, counsel for Defendant.

MORAN, SANCHY & ASSOCIATES
2197 Ringling Blvd.
Sarasota, Florida 34237
P: (941) 366-1800
F: (941) 954-7101

*/s/ Don Cahall*

**Don R. Cahall**
Florida Bar No. 110578
E-mail: donrcahall@gmail.com

cc. Alpine Reporting

## SCHEDULE "A"

1. Any and all materials you reviewed in this matter, including, but not limited to public record requests, discovery documents, interrogatories, investigative materials, correspondence, photographs, reports, books, articles, literature, films, tests, experiments, statements, or other reference materials that you used or are relying on, or used for any basis of your opinion.

2. A copy of your expert report that was prepared for this case.

3. Any and all reports which were furnished to you by other experts in this case.

4. Your current curriculum vitae.

5. Any and all results of tests you, your agents, or employees conducted in this case.

6. Your complete billing file in this case, including, but not limited to, the charges you have rendered, the statements that you have rendered, the time spent on this case, and other relevant materials concerning the time and billing on this case.

7. Any and all photos you have taken or reviewed in this case.

8. Any written statements, depositions, video or audio you have reviewed, or prepared.

9. All policies and procedures you have reviewed from any source, whether for K9s or any other reason.

10. List of all cases you have rendered an opinion in during the past 3 years.